[Crim. No. 11370.    Second Dist., Div. One.    July 15, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. WILLIAM ARNOLD, JR., Defendant and Appellant.

E. Fred Lightner for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Anthony M. Summers, Deputy Attorney General, for Plaintiff and Respondent.

LILLIE, J.—Defendant was convicted by the court on three counts of bookmaking (count I—§ 337a, subd. 1, Pen. Code; count II—§ 337a, subd. 2; count III—§ 337a, subd. 4). No disposition was made of the two prior felony convictions alleged in the information. Motion for new trial and probation were denied and defendant was sentenced to 180 days in the county jail. At the same time defendant was found to be in violation of probation granted on a prior bookmaking conviction (§ 337a), the same was revoked and he was sentenced to 90 days on each count, the sentences to run concurrently, but consecutively to the 180-day sentence herein. We treat defendant's appeal from "judgment of conviction and from the orders denying probation" as one from the judgment and order revoking probation.

On August 8, 1964, Officers McCarthy, Dean and Lethin rode in a police vehicle to a location a block and a half from 9503 South Avalon which consists of a one-story building in which are located a shoeshine stand and "recreation parlor." Observing this location for 20 or 30 minutes, Officer McCarthy saw 20 to 30 people enter and leave the building;

some remained inside, others stayed only a minute or two. Thereafter, the officers entered through the front door leading into the main room which appeared to be a place of business open to the public; it contained a pool table, juke box, chairs and tables. Officer McCarthy then entered a portion of the building separated from this room by some kind of partition; there was a doorway through which he walked, but no door. This part of the building contained chairs; there was no sign indicating that it was banned to the public. In one of the walls of this room was a hole approximately one and one-half feet square; Officer McCarthy looked through the hole into another room. The hole had no door or cover. Through it he observed in the other room a formica topped table, telephone, National Daily Reporters, other racing publications and a wet rag. A number of people in the room were consulting the racing publications.

Officer McCarthy, an expert on the manner and methods in which bookmaking is conducted in Los Angeles County and the science, symbols and paraphernalia used therein, knew the National Daily Reporter to be a daily publication containing information regarding horse races at various places throughout the United States; some of the other publications in the room were racing forms from the local newspapers and material regarding a Mexican race track. After looking through the hole and observing the telephone, racing forms, formica table, etc., in the other room, Officer McCarthy formed the opinion that bookmaking was being conducted therein. Thus, he walked into a corridor through an open door and into the room containing these items. Upon observing the wall in this room and notations written in pencil, he formed the further opinion that the notations were a record of wagers on horse races. At that time defendant spoke to Officer McCarthy; the latter asked "if the action was busy"; defendant said it was. When asked if the pencil notations on the wall were his, defendant said, "No, you know I don't write on the wall, I use the table." The telephone rang and an officer answered. A female voice offered a wager on a horse race. At the end of this conversation defendant was placed under arrest. A subsequent search of the premises disclosed a formica strip containing a number of notations in pencil which Officer McCarthy testified were records of wagers on horses. Formica is frequently used by bookmakers in Los Angeles County since the markings on it can be quickly erased or wiped off. The handwriting on the formica strip was the same as that on defendant's exemplar;

the marking on the formica correlated with the National Daily Reporter indicating that it was, in fact, a betting marker. Prior to August 8 Officer McCarthy had made numerous visits to the above location during which defendant was present— defendant had been seen sitting at a desk on several occasions. At this table the officers found a telephone bill bearing defendant's name and the address, 9503 South Avalon.

Appellant contends mainly that the only evidence received at the trial was obtained as a result of an illegal search and seizure. He argues that the officers, without a warrant, entered private premises without permission.

The evidence establishes that the officers had reasonable cause to believe that the defendant had committed and was in the process of committing a felony. (§ 836, Pen. Code; *People* v. *Ingle,* 53 Cal.2d 407, 412 [2 Cal.Rptr. 14, 348 P.2d 577]; *People* v. *Ketchel,* 59 Cal.2d 503, 526 [30 Cal.Rptr. 538, 381 P.2d 394].) ■ "Reasonable cause exists when the facts and circumstances within the knowledge of the officer '. . . at the moment of the arrest would "warrant a man of reasonable caution in the belief" that an offense had been committed. [Citations.]' " (*People* v. *Schader,* 62 Cal.2d 716, 722 [44 Cal.Rptr. 193, 401 P.2d 665].) ■ At the time the officers went to the Avalon Street address they had been given certain official information and been ordered to make a bookmaking investigation; a complaint had been made to administrative vice that bookmaking was being conducted there. Officer McCarthy knew defendant; he had previously arrested him for bookmaking at the same location, and on numerous other prior occasions had observed him at that address. He had visited the premises many times and, while it was a shoeshine stand, he had never once observed any shoeshining activity or even a can of shoe polish. It was with this information that Officer McCarthy and the others began a surveillance of the premises. During the 20 or 30 minutes they watched, they saw 20 or 30 people going in and out. When Officer McCarthy entered the building, he found himself in a room containing a juke box, pool table and chairs, which room appeared to be a business open to the public. ■ Certainly this entry into a place open to the public constituted no invasion of defendant's rights, nor was it improper for the police, once inside, to make their observations. On a pool table they saw a National Daily Reporter. The room was divided by a partition and there was a doorway, without a door, leading into the second portion of the room. There was no indication anywhere that this portion

of the room was private; it also contained chairs. From this room a hallway led to the back of the building to a toilet; on prior visits to the premises Officer McCarthy had seen members of the public going through this hallway to use the toilet. It is in the second portion of the front room that the officer found an open hole in the wall through which he made certain observations—a telephone, formica top table, wet rag, National Daily Reporters and other racing publications, all of which items had significance to him with respect to bookmaking—and knew from these items and the activity connected with them that bookmaking was being carried on in the premises. At that point Officer McCarthy was clearly justified in making further investigation by entering the room containing the telephone and other items. After finding on the table a telephone bill addressed to defendant, talking to him and hearing a telephone conversation in which the caller offered a wager on a horse race, Officer McCarthy had knowledge of facts which would cause any reasonable person to believe that defendant had committed and was in the process of committing a crime—bookmaking.

As to whether the police were justified in entering the room where the hole was located, the evidence shows that this room which led off of a public room was also open to the public. Officer McCarthy on other occasions had seen members of the public enter this room; the doorway had no door and was open; and there was no indication of any kind that the room was private. It was reasonable for the officers to believe that this room too was open to the public.

Having entered, the officer had a right to look through the hole. In *People* v. *Sanders,* 46 Cal.2d 247 [294 P.2d 10], relied upon by appellant, the court did not say that it was improper to look through such an opening, only that, ''When the officers looked through the door they saw nothing that was incriminating.'' (P. 249.) Here Officer McCarthy saw evidence through the hole which, in his expert opinion, indicated that bookmaking was being carried on. It was proper for the officers to make these observations, and since looking through the hole does not constitute an unreasonable search, the officers were entitled to act upon what they saw and arrest defendant. (*People* v. *Martin,* 45 Cal.2d 755, 762 [290 P.2d 855].) *Britt* v. *Superior Court,* 58 Cal.2d 469 [24 Cal.Rptr. 849, 374 P.2d 817], and *Bielicki* v. *Superior Court,* 57 Cal.2d 602 [21 Cal. Rptr. 552, 371 P.2d 288], are not factually similar; there, observations made by the police were such as could be made

only from premises which were not open to the public. Here Officer McCarthy made the same observations as could be made by any member of the public walking through the room to go to the toilet in the rear of the building. (See *People* v. *Norton,* 209 Cal.App.2d 173, 175-176 [25 Cal.Rptr. 676].)

We conclude that the arrest was lawful; thus, the search of the premises and seizure of the bookmaking paraphernalia incident to the lawful arrest were reasonable and proper. (*People* v. *Torres,* 56 Cal.2d 864, 866 [17 Cal.Rptr. 495, 366 P.2d 823] ; *People* v. *Cedeno,* 218 Cal.App.2d 213, 218 [32 Cal.Rptr. 246] ; *People* v. *Schultz,* 238 Cal.App.2d 804, 810 [48 Cal.Rptr. 328] ; *People* v. *Gilbert,* 63 Cal.2d 690, 707 [47 Cal.Rptr. 909, 408 P.2d 365].)

Appellant's second point is that the handwriting exemplar was received in evidence without a showing that he was advised of his constitutional rights before the same was made. The evidence shows that when defendant was booked, he freely and voluntarily affixed a sample of his handwriting to an exemplar card. It was stipulated at the time of the preliminary hearing that Officer Franck was deemed to have been called, sworn and qualified as an expert in the analysis of handwriting and would testify that he compared the handwriting on the exemplar cards with the figures on the formica piece and formed the opinion that the handwriting is that of one and the same person. The record shows that no objection to the evidence was made at the time of the preliminary hearing (August 20, 1964) or at the time of trial (March 25, 1965), long after the decisions in *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. Appellant had the duty to object in the court below to preserve his rights on appeal. (*People* v. *Brown,* 238 Cal.App.2d 924, 929 [48 Cal.Rptr. 204] ; *People* v. *Palmer,* 236 Cal.App.2d 645, 650 [46 Cal.Rptr. 449] ; *People* v. *Almond,* 239 Cal.App.2d 46, 49-50 [48 Cal.Rptr. 308].) Appellant relies on *People* v. *Graves,* which, at the time he filed his opening brief, was reported at (Cal.App.) 45 Cal.Rptr. 118, but was pending before the Supreme Court. *People* v. *Graves* has recently been decided by that court (64 Cal.2d 208, 210-211 [49 Cal. Rptr. 386, 411 P.2d 114]) adversely to appellant's contention; this case is controlling herein. Under *Graves* the admission in evidence of the exemplar was proper. The court held that the privilege against self-incrimination extends to writings and statements, but not to physical characteristics. Here, as in

*People* v. *Graves,* it was the physical characteristic of the writing and not the truth of the statement that provided the evidence against the defendant.

The judgment and order are affirmed.

Wood, P. J., and Fourt, J., concurred.