[L.A. No. 30918. Jan. 12, 1979.]

JAMES M. CRAMER, as District Attorney, etc.,
Petitioner and Respondent, v.
LUTHER TYARS, Objector and Appellant.

134

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

## COUNSEL

Charles E. Ward, Public Defender, and Littleton M. Gunn, Deputy Public Defender, for Objector and Appellant.

Paul Halvonik, State Public Defender, Gary S. Goodpaster, Chief Assistant State Public Defender, Paul Fogel, Quin Denvir and Richard E. Shapiro, Deputy State Public Defenders, as Amici Curiae on behalf of Objector and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Karl J. Phaler, Jay M. Bloom and Cecilia H. Johnson, Deputy Attorneys General, for Petitioner and Respondent.

## OPINION

**RICHARDSON, J.**—May a mentally retarded person who is the subject of a petition for civil commitment to the state Department of Health pursuant to former Welfare and Institutions Code section 6502 (all further statutory references are to that code unless otherwise cited) be called as a witness at the commitment hearing? We conclude that he may.

Preliminarily, we review certain provisions of sections 6500-6512 governing the commitment proceedings in issue. Section 6502 authorizes the verified petition for commitment be filed by the following: a parent, guardian, or other person charged with the support of the mentally retarded person, any district attorney or probation officer, the Youth Authority, any person so designated by the superior court in the county of the persons's residence, or by the Director of Corrections. Mentally retarded persons are defined as those nonpsychotic persons "who are so mentally retarded from infancy or before reaching maturity that they are incapable of managing themselves and their affairs, independently, with

ordinary prudence, or of being taught to do so, and who require supervision, control, and care, for their own welfare or the welfare of others, or for the welfare of the community" (§ 6500). Only those mentally retarded persons who constitute a danger to themselves or others can be committed to the Department of Health and the commitment is for one year's duration subject to renewal by the same petition process (§ 6500.1).

Upon the filing of such petition the matter is set for hearing. The alleged mentally retarded person must be notified of the hearing, and, if the petition is filed by a probation officer, district attorney, the Youth Authority, or the Director of Corrections, the person's parent or guardian also must be given such notice as is deemed proper by the court (§ 6504). Counsel must be furnished unless the person has his own attorney (§ 6500.1). At the hearing section 6507 directs the court to inquire into the "condition or status" of the alleged mentally retarded person and authorizes the court to invoke its subpoena power to require the attendance of medical specialists who have "made a special study of mental retardation," a clinical psychologist and such other persons "as it deems advisable, to give evidence." Finally, section 6509 governs placement procedures.

Against this statutory background we trace appellant's history. Tyars was born on February 12, 1957. At the time of the commitment proceedings under consideration he was almost 20 years old. Before 1965 he had lived with his mother in the Los Angeles area, and from 1965 to 1971 he was in a residential center in Ontario, California. In January 1971 Tyars was placed in the Patton State Hospital in San Bernardino County because of assaultive behavior against his family. Appellant has resided at Patton since that time.

On April 12, 1976, the District Attorney of San Bernardino County filed in the superior court of that county a petition for the commitment of appellant as a mentally retarded person pursuant to section 6502. The petition duly alleged the fact of Tyars' mental retardation and that he was a danger to himself or others. The court appointed a public defender to represent appellant and the matter was set for hearing. The court also granted appellant's request for trial by jury, required that any verdict be unanimous, allowed 13 peremptory challenges, and instructed the jury that it must find in favor of Tyars unless convinced of the truth of the essential allegations of the petition beyond a reasonable doubt.

Two medical examiners at the hearing diagnosed Tyars' condition as mental retardation encephalopathy caused by a postnatal injury. The experts described further medical findings: that he suffered from seizures which were controlled by use of drugs such as dilantin, phenobarbital, and mysoline; that, depending on the measuring test used, Tyars' I.Q. was between 48 and 57, well below the average range of 90-110; and that he was incapable of functioning in a community without supervision. The examiners concluded that his mental defect is permanent and that he is a danger to himself or others. Evidence further adduced at the hearing established that appellant lacks communication skills and has a physical problem, a speech impediment diagnosed as "dysarthria," in which the muscles controlling speech do not permit the affected person to enunciate words clearly. A psychiatric technician at Patton State Hospital, describing appellant's assaultive behavior, testified that Tyars had often attacked other residents and staff members of the hospital, including the technician, using his fists, tables, cue balls, or cue sticks, causing personal injuries and property damage.

At the hearing and over the objections of his counsel appellant was called as a witness pursuant to Evidence Code section 776 which provides for the examination of an adverse party in any civil action. The customary oath was not administered to him (he sat wherever it was comfortable for him in the courtroom) but the trial judge elicited a promise from him that he would tell the truth. The court expressly found that Tyars, while incapable of understanding the oath, did understand the obligation to tell the truth.

Because of his speech handicap Tyars had difficulty in making himself understood. The trial court thereupon caused an "interpreter" who was familiar with appellant's speech to be sworn to "translate English into English," i.e., to make his answers intelligible. The court's questions posed to Tyars were not restated by the interpreter; moreover, Tyars' understandable words were not always the same as those repeated by the interpreter who would either summarize Tyars' answer or simply answer the court directly. In substance, Tyars admitted several acts of violence including the throwing of chairs, "breaking someone's head wide open," and striking a hospital technician; he also named victims of other assaults and batteries and illustrated his testimony by swinging his arms in descriptive punching motions.

After 38 minutes of deliberations the jury returned its verdict finding that appellant was a mentally retarded person who is a danger to himself

and others. The court thereafter ordered that he be committed to the Department of Health for placement in a state hospital.

## AVAILABILITY AS A WITNESS

The principle issue raised by appellant is the propriety of calling him, over objections, as a witness in his own commitment hearing.

We stress, preliminarily, the two separate and distinct testimonial privileges here involved. In a *criminal* matter a defendant has an absolute right not to be called as a witness and not to testify. (Amend. V of the U.S. Const. and art. I, § 15, of the Cal. Const. as codified in Evid. Code, § 930.) Further, in any proceeding, *civil or criminal,* a witness has the right to decline to answer questions which may tend to incriminate him in criminal activity (Evid. Code, § 940). However, as we shall develop more fully, notwithstanding these privileges, no witness has a privilege to refuse to reveal to the trier of fact his physical or mental characteristics where they are relevant to the issues under consideration.

Several features of the applicable statutes (§§ 6500-6512) persuade us that commitment of mentally retarded persons must be deemed essentially civil in nature. The commitment is not initiated in response, or necessarily related, to any criminal acts; it is of limited duration, expiring at the end of one year and any new petition is subject to the same procedures as an original commitment (§ 6500.1); the petitioner need not be a public prosecutor, but may be any parent or other person designated by the court (§ 6502). The sole state interest, legislatively expressed, is the custodial care, diagnosis, treatment, and protection of persons who are unable to take care of themselves and who for their own well being and the safety of others cannot be left adrift in the community. The commitment may not reasonably be deemed punishment either in its design or purpose. It is not analogous to criminal proceedings.

■ The predominantly civil character of the proceedings created by sections 6500-6512 establishes that appellant did not have an absolute right, as does a defendant in a criminal action, not to be called as a witness and not to testify. (*Black* v. *State Bar* (1972) 7 Cal.3d 676, 685 [103 Cal.Rptr. 288, 499 P.2d 968]; *In re Vaughan* (1922) 189 Cal. 491, 495-497 [209 P. 353, 24 A.L.R. 858]; *People* v. *Whelchel* (1967) 255 Cal.App.2d 455, 460 [63 Cal.Rptr. 258].) As expressed by the highest authority, the historic purpose of the privilege against being called as a witness has been to assure that the *criminal* justice system remains accusatorial, not

inquisitorial. (*Malloy* v. *Hogan* (1964) 378 U.S. 1, 11 [12 L.Ed.2d 653, 661-662, 84 S.Ct. 1489]; *Murphy* v. *Waterfront Comm'n.* (1964) 378 U.S. 52, 55 [12 L.Ed.2d 678, 681-682, 84 S.Ct. 1594]; *Hoffman* v. *United States* (1951) 341 U.S. 479, 485-486 [95 L.Ed. 1118, 1123-1124, 71 S.Ct. 814].) The extension of the privilege to an area outside the criminal justice system, in our view, would contravene both the language and purpose of the privilege.

█ It follows from the foregoing that while appellant could properly be called as a witness at his commitment proceeding, like any other individual in any proceeding, civil or criminal, he could not be required to give evidence which would tend to incriminate him in any criminal activity and which could subject him to criminal prosecution. █ Referring to the sweeping nature of the privilege against self-incrimination, the United States Supreme Court has said: " 'The privilege can be claimed in *any proceeding*, be it criminal or civil, administrative or judicial, investigatory or adjudicatory . . . it protects *any disclosures* which the witness may reasonably apprehend *could be used in a criminal prosecution or which could lead to other evidence that might be so used.*' [Fn. omitted.] (Italics added.)" (*In re Gault*, 387 U.S. 1, 47-48 [18 L.Ed.2d 527, 557, 87 S.Ct. 1428], from conc. opn. by Justice White in *Murphy* v. *Waterfront Comm'n., supra*, 378 U.S. 52, 94 [12 L.Ed.2d 678, 704].) As we have noted previously, no mentally retarded person may be committed unless such person is a danger to himself or others (§ 6500.1). █ To the extent that the necessary elements of mental retardation and dangerousness may be established by evidence of criminal conduct, such evidence must, in its entirety, be elicited from sources other than the individual who is the subject of the commitment proceeding. In the matter before us the trial court, referring to Tyars, observed that "This is not a proceeding in which he could refuse to testify on the grounds that his testimony might tend to incriminate him." This was error./As we have explained, appellant could clearly have refused to testify regarding any *criminal* conduct in which he might have engaged or about any other matter which would tend to implicate him in *criminal* activity.

Because appellant's counsel initially objected to Tyars testifying, we infer no waiver of the privilege against self-incrimination by counsel's failure to renew his initial self-incrimination objection in response to subsequent specific questions. In the light of the trial judge's clear expression of his position on the issue such repeated objections would have been futile.

■ We are of the view, however, that the foregoing error does not require a reversal under these circumstances. There was overwhelming evidence of appellant's severe and irreversible mental retardation from both medical experts. The testimony of these two witnesses in conjunction with that of the psychiatric technician who, along with others, had been the object of appellant's repeated assaultive behavior established beyond question that he was a danger to himself and others. No contrary evidence was introduced. Given the weight and nature of the uncontradicted evidence supporting the allegations of the petition it is clear that any erroneous questioning of the appellant was harmless beyond all reasonable doubt. (*Chapman* v. *California* (1966) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

■ We conclude that, while appellant could not be questioned about matters that would tend to incriminate him, he was subject to call as a witness and could be required to respond to nonincriminatory questioning which may have revealed his mental condition to the jury, whose duty it was to determine whether he was mentally retarded. Reason and common sense suggest that it is appropriate under such circumstances that a jury be permitted fully to observe the person sought to be committed, and to hear him speak and respond in order that it may make an informed judgment as to the level of his mental and intellectual functioning. The receipt of such evidence may be analogized to the disclosure of physical as opposed to testimonial evidence and may in fact be the most reliable proof and probative indicator of the person's present mental condition. (See *People* v. *Ellis* (1966) 65 Cal.2d 529, 533-534 [55 Cal.Rptr. 385, 421 P.2d 393] [voice identification not within the privilege against self-incrimination]; *People* v. *Arnold* (1966) 243 Cal.App.2d 510 [52 Cal.Rptr. 475] [handwriting identification not within the privilege against self-incrimination].) Similarly, a defendant even in a criminal proceeding may be required to give "real or physical" evidence in contrast to "communications or testimony" in the sense of disclosing knowledge. Thus the criminal defendant may be asked to stand, wear clothing, hold items, or speak words. (*People* v. *Ellis, supra,* at pp. 533-534; *People* v. *Sims* (1976) 64 Cal.App.3d 544, 552 [134 Cal.Rptr. 566].) It was proper for the jury to have the benefit of its own observations of Tyars' responses, both in manner and content, to the court's questions.

Appellant Tyars' remaining contentions necessitate only brief comment.

CAPACITY AS A WITNESS

Appellant now argues that he was incompetent to be a witness because of mental incapacity. His counsel, however, made no objection as to his competency as a witness at any time during the hearing and the objection must therefore be deemed waived. (*People* v. *Berry* (1968) 260 Cal.App.2d 649, 652-653 [67 Cal.Rptr. 312].) ■ Nor do we find merit in appellant's claim that his speech handicap necessarily made him an incompetent witness. As previously noted, a ward attendant who was very familiar with appellant's speech served as an "interpreter" and there was no contention made at the hearing that this arrangement was unsatisfactory.

JURISDICTION

■ Appellant challenges the jurisdiction of the San Bernardino County Superior Court on the basis that, although Tyars has been hospitalized at Patton State Hospital in San Bernardino County since 1971, his parents "reside" in Los Angeles County. The controlling section, 6502, provides that "A petition for the commitment of a mentally retarded person to the State Department of Health . . . may be filed in the superior court of the county in which such person resides . . . ." The term "resides" has received differing interpretations depending on the context and purpose of the statute in which it appears. (See *Kirk* v. *Regents of University of California* (1969) 273 Cal.App.2d 430, 434-435 [78 Cal.Rptr. 260].) The inquiry into the degree of mental retardation and dangerousness mandated by section 6507 strongly suggests that periodically, perhaps annually, treating physicians and other witnesses must be produced in court in order to testify as to the present mental condition and potential danger from the subject, who also should be present during such inquiry. Under such circumstances, to define "the county in which such person resides" as other than that in which he is hospitalized would seem to be both untenable and impractical. Furthermore, the interpretation which we herein indulge seems consistent with legislative intent, recently expressed in Health and Safety Code section 38450, that a habeas corpus hearing be held in the county of hospitalization for review and release of all admitted or committed developmentally disabled. In this connection, similar considerations of convenience and economy suggest a like result for those who may be mentally retarded.

PLACEMENT HEARING

■ Appellant contends that immediately following the jury's finding that he was mentally retarded and a danger to himself or others the court should have held a hearing to determine the least restrictive placement facility in which appellant could be placed. Such a hearing is not required.

Section 6509 provides that "[i]f the court finds that the person is mentally retarded . . . the court may make an order that the person be committed to the State Department of Health for hospitalization." Appellant contends that use of the word "may" in section 6509 renders the provisions of that section permissive, thus requiring that the availability of alternate placements be considered by the court. This interpretation is incorrect. No statutory power is given to the court to do other than to commit the dangerous mentally retarded person to the Department of Health for hospitalization. Such an interpretation is consistent with section 6502 which requires that the petition filed under section 6500 shall seek a commitment to "state hospital." The Legislature did not vest the courts with the power to determine the precise institutional placement that should be made. Courts are ill-suited for this task which is more properly the function of an appropriate medical administrative agency.

■ Appellant nonetheless contends that because former Health and Safety Code section 38009.2, now Welfare and Institutions Code section 6513, provides for placement in the least restrictive residential facility in the case of *developmentally disabled* persons who are subjects of civil commitment proceedings, equal protection principles therefore mandate that we read into section 6509 such a provision for "least restrictive" placement in the case of a dangerous mentally retarded person.

We conclude, however, that there is a rational basis for the distinction made by the Legislature between the placement procedures to be followed in regard to these two classes of individuals. The Legislature has determined that in the case of the *dangerous* mentally retarded person the only suitable treatment is confinement in a state hospital. A similar result does not necessarily follow in the case of the developmentally disabled person because no finding of dangerousness is required for commitment of the latter. Assuming, for purposes of discussion, that a strict scrutiny test is the proper equal protection standard to be applied in the instant case because of the liberty interest involved, there exists a clear and

compelling state interest in the classification in issue. By very definition, in the case of the dangerous mentally retarded person, the state has a strong interest in protecting the general public, other patients, and the institutional personnel, from physical harm. Hospitalization in a state hospital serves to guarantee such protection, providing as it does the requisite trained assistants to restrain those who may become violent. Accordingly, appellant's equal protection argument must fail.

## DANGEROUSNESS AS AFFECTED BY MEDICATION

■ Appellant's final contention is that the jury should have been allowed to consider his condition under medication in making its determination whether he was dangerous and that an instruction to the jury to this effect was improperly refused. The proposed instruction read, "In determining whether Luther Tyars is a danger to himself or others you may take into account improvement due to medication if it is likely that in the foreseeable future Luther Tyars would be provided with and take needed medication." In seeking such an instruction, appellant's counsel exceeded review of appellant's current mental condition and potential for dangerous behavior and invited consideration of possible future behavior under hypothetical conditions. The pertinent issue under section 6507 is the present "condition or status" of the alleged mentally retarded person. The Legislature has not elected to authorize consideration of the factors of medication, or future changes in the patient's condition. The proposed instruction was, accordingly, properly refused.

The judgment is affirmed.

Tobriner, J., Mosk, J., Clark, J., and Manuel, J., concurred.

BIRD, C. J., Dissenting.—The authors of the Bill of Rights understood that the common law privilege against self-incrimination was the product of an historic struggle to free individuals from the oppression of government and the secret interrogations of the Star Chamber. Recognizing the privilege's central place in our system of liberty, the framers secured it in the firm constitutional footing of the Fifth Amendment. Since that time, the privilege has been accorded a broad and generous construction in keeping with its station as "the mainstay of our adversary system." (*Miranda* v. *Arizona* (1966) 384 U.S. 436, 460, 461 [16 L.Ed.2d 694, 715-716, 86 S.Ct. 1602, 10 A.L.R.3d 974]; see, e.g., *In re Gault* (1967) 387 U.S. 1, 50 [18 L.Ed.2d 527, 558-559, 87 S.Ct. 1428]; *Boyd* v. *United States* (1886) 116 U.S. 616, 633-635 [29 L.Ed. 746, 752-753, 6 S.Ct. 524].)

Today's decision departs from that established principle by applying the privilege in a rigid and grudging way. The majority treat the privilege as an historical relic, not as a living legacy capable of adjusting its scope to the demands of modern experience. In the process, the majority revert to a mode of analysis which has been repeatedly rejected as a method of determining the safeguards which must apply in commitment proceedings. I respectfully dissent from this reasoning and from a result which degrades the constitutional rights of mentally retarded persons threatened with a loss of their liberty.

## I

A brief elaboration of the pertinent facts is in order. Pursuant to Welfare and Institutions Code section 6500.1,[1] the district attorney of San Bernardino County initiated commitment proceedings against appellant who was alleged to be a dangerous mentally retarded person. Over appellant's objections, the judge ruled that appellant could not refuse either (1) to be a witness in the proceeding or (2) to give testimony which might incriminate him.

Appellant was called as a witness and the judge asked him whether he had been involved in any fights. Apparently unaware of the consequences to himself, appellant dramatized his affirmative reply by swinging his fists like a fighter and by uttering emphatic "pows" in a child-like effort to simulate the sound of his fists making contact. All of this occurred in front of the jury.

As the majority note, because of a speech defect, appellant's testimony was "interpreted" by a hospital attendant. However, the majority fail to point out that this "interpreter" was also the prosecutor's main witness *against* appellant on the issue of his dangerousness. Thus, an adverse witness was allowed to "interpret" appellant's testimony, even though the "interpretations" sometimes differed from appellant's understandable words and the "interpreter" sometimes answered the court's questions directly.

The prosecutor presented three witnesses. One was a physician who had interviewed appellant for one-half hour. Another was a clinical psychologist whose personal contact with appellant was limited to the administration of intelligence quotient tests. Only the hospital attendant

---

[1] Unless otherwise specified, all statutory references hereinafter are to the Welfare and Institutions Code.

who had served as appellant's "interpreter" could testify from personal knowledge to any aggressive conduct by appellant. All of the acts which the attendant described occurred while appellant was confined in a state hospital.

After a brief deliberation, the jury returned a verdict finding appellant to be a dangerous mentally retarded person.

## II

The Fifth Amendment declares unequivocally that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." The same guarantee is enshrined in article I, section 15 of the California Constitution. These provisions confer to *any witness* the privilege not to give answers which might incriminate him. (E.g., *Black* v. *State Bar* (1972) 7 Cal.3d 676, 685 [103 Cal.Rptr. 288, 499 P.2d 968].) They also accord *the defendant* in a "criminal case" the right not to testify at all. (See *ibid.*)

This right not to testify serves at least two important functions. It protects the defendant, who is often unschooled in the law, from being called to the witness stand where he might inadvertently waive his privilege against self-incrimination by giving testimony which bears on an element of the crime. (Cf. *People* v. *Schader* (1969) 71 Cal.2d 761, 770 [80 Cal.Rptr. 1, 457 P.2d 841].) Further, by granting this broad right to silence, our system acknowledges the prejudicial inference of guilt commonly drawn from an assertion of Fifth Amendment rights. It is fundamentally unfair to require a person to become a witness and be forced to invoke his right to silence in front of the jury in whose hands his liberty lies. (*People* v. *Talle* (1952) 111 Cal.App.2d 650, 661-662, 667-668 [245 P.2d 633].)

It has long been established that the right not to be called as a witness is not limited to defendants in ordinary criminal prosecutions. (*In re Gault, supra,* 387 U.S. at pp. 49-50 [18 L.Ed.2d at pp. 558-559]; *Thurston* v. *Clark* (1895) 107 Cal. 285, 288-290 [40 P. 435]; see also *United States* v. *U.S. Coin & Currency* (1971) 401 U.S. 715, 718 [28 L.Ed.2d 434, 437, 91 S.Ct. 1041].) The right also extends to proceedings which, though civil in name, threaten a person with the loss of his liberty. (*In re Gault, supra*; see *McNeil* v. *Director, Patuxent Institution* (1972) 407 U.S. 245, 257 [32 L.Ed.2d 719, 727, 92 S.Ct. 2083] (conc. opn. of Douglas, J.); cf. *In re Winship* (1970) 397 U.S. 358, 365-366, 368 [25 L.Ed.2d 368, 375-376, 377-378, 90 S.Ct. 1068].)

In *Gault*, the Supreme Court ruled that a juvenile court judge may not elicit incriminating testimony from a minor without first advising him of his right not to testify. (387 U.S. at pp. 43-44, 49-50 [18 L.Ed.2d at pp. 554-556, 558-559].) The court's rationale was explicit: "[Commitment] is incarceration against one's will, whether it is called 'criminal' or 'civil.' And our Constitution guarantees that no person shall be 'compelled' to be a witness against himself *when he is threatened with deprivation of his liberty . . . ." (Id.,* at p. 50 [18 L.Ed.2d at pp. 558-559], italics added; see also McCormick on Evidence (Cleary ed. 1972) § 121, p. 259.)

Thus, *Gault* teaches that the *actual consequences,* not the label, of a proceeding determine whether fundamental rights are constitutionally mandated in that proceeding. Three years after *Gault,* this lesson was reaffirmed when the Supreme Court held that juveniles in delinquency hearings are constitutionally entitled to be judged by the standard of proof beyond a reasonable doubt. (*In re Winship, supra,* 397 U.S. at p. 368 [25 L.Ed.2d at pp. 377-378].) "We made clear in [*Gault*] that civil labels and good intentions do not themselves obviate the need for criminal due process safeguards . . . ." (*Id.,* at pp. 365-366 [25 L.Ed.2d at p. 376].) The court decided that such safeguards *were* needed because an adverse determination could deprive a minor of both his liberty and his good name. (*Id.,* at p. 367 [25 L.Ed.2d at p. 377].)

This court has also held that persons subject to involuntary commitment proceedings have a right to the protections afforded to ordinary criminal defendants. Thus, individuals whom the state seeks to confine as mentally disordered sex offenders (§ 6300 et seq.) or as narcotics addicts (§ 3000 et seq.) are constitutionally entitled to the safeguards of proof beyond a reasonable doubt and a unanimous jury verdict. (*People* v. *Burnick* (1975) 14 Cal.3d 306, 322 [121 Cal.Rptr. 488, 535 P.2d 352]; *People* v. *Feagley* (1975) 14 Cal.3d 338, 351-352 [121 Cal.Rptr. 509, 535 P.2d 373]; *People* v. *Thomas* (1977) 19 Cal.3d 630, 641, 644 [139 Cal.Rptr. 594, 566 P.2d 228].) These holdings flowed from the logic of *Winship*: the protections afforded to the usual criminal defendant were required in commitment proceedings because these defendants also stood to lose their liberty and their good names. (*Burnick, supra,* at pp. 318-322; *Feagley, supra,* at p. 347; *Thomas, supra,* at pp. 638-641, 644.)

The reasoning of *Burnick, Feagley* and *Thomas* applies equally to the present case because appellant faces equivalent consequences. Commitment to a mental hospital entails a "massive curtailment of liberty" and a comparable loss of reputation. (*Humphrey* v. *Cady* (1972) 405 U.S. 504,

509 [31 L.Ed.2d 394, 402-403, 92 S.Ct. 1048]; *In re Roger S.* (1977) 19 Cal.3d 921, 928-929 [141 Cal.Rptr. 298, 569 P.2d 1286].) Indeed, the threat of losing one's freedom is far more certain for individuals in appellant's position than for the minors in *Gault* and *Winship*. A juvenile found to be a delinquent may or may not be committed to an institution. (§§ 727, 731.) In contrast, a dangerous mentally retarded person *must* be committed to a state hospital. (Maj. opn., *ante,* at p. 141.)[2]

Similarly, an adjudication that one is dangerous and mentally retarded creates a greater stigma than an adjudication of delinquency. As this court pointed out in *Burnick,* juvenile offenses are often discounted or forgiven as the product of a passing phase of youth. (14 Cal.3d at p. 322.) The same cannot be said for individuals found to be dangerous and mentally retarded. This court's frank recognition in *Burnick* of the social disgrace that often attaches to mental illness is equally applicable to the mentally retarded. (*Id.,* at p. 321.) When an official determination of dangerousness is added, "the shame is complete." (*Ibid.*)

Thus, appellant faced the same consequences as those at stake in *Burnick, Feagley* and *Thomas*—incarceration and social stigma. The logic of those cases compels the conclusion that defendants in section 6500 proceedings are also entitled to the protections of criminal due process. The right not to testify is at least as fundamental a safeguard as proof beyond a reasonable doubt and a unanimous jury verdict. (Compare *In re Gault, supra,* 387 U.S. at pp. 43-50 [18 L.Ed.2d at pp. 554-559] with *In re Winship, supra,* 397 U.S. at p. 368 [25 L.Ed.2d at pp. 377-378] and *McKeiver* v. *Pennsylvania* (1971) 403 U.S. 528, 545 [29 L.Ed.2d 647, 660-661, 91 S.Ct. 1976].) It follows that appellant should not have been called as a witness.

The majority's analysis of the consequences to appellant of an adverse determination is wholly inadequate. The majority find it significant that confinement under section 6500.1 is only for one year. (Maj. opn., *ante,* at p. 137.) However, it would be startling to assert that defendants in misdemeanor cases may be compelled to testify because their potential incarceration is also "of limited duration," in most cases a maximum of

[2]Today's decision holds that under section 6509, a trial judge has no choice but to commit dangerous mentally retarded persons to state hospitals. This ruling is contrary to legislative intent. Section 6509 provides that the trial court "may" commit these persons to a state hospital. It is an extraordinary construction which transforms the permissive "may" into the mandatory "shall." The fact that the commitment petition under section 6502 seeks placement in a state hospital does not justify the removal from the trial court of all discretion to order a more suitable disposition if one is available in a particular case.

only six months. (See Pen. Code, § 19.) In addition, the majority fail to properly emphasize that commitments under section 6500.1 may be renewed. Thus, to characterize the confinement as "of limited duration" ignores this court's description of renewable commitments in an analogous context: "The theoretical maximum period of detention is *life* as successive petitions may be filed . . . ." (*In re Gary W.* (1971) 5 Cal.3d 296, 300 [96 Cal.Rptr. 1, 486 P.2d 1201], italics added.)

Further, the majority identify the aims of confinement in this case as treatment and protection, not punishment. (Maj. opn., *ante*, at p. 137.) However, benevolent objectives—which may or may not reflect reality in our state hospitals[3]—will not substitute for criminal safeguards in proceedings where liberty is at stake. (*In re Winship, supra*, 397 U.S. at p. 365 [25 L.Ed.2d at pp. 375-376]; *In re Gault, supra*, 387 U.S. at pp. 27-28 [18 L.Ed.2d at pp. 545-547].) The critical fact is the potential for involuntary confinement. It does not matter that the confinement "is designed not so much as retribution as it is to keep individuals from inflicting future harm." (*Specht* v. *Patterson* (1967) 386 U.S. 605, 608-609 [18 L.Ed.2d 326, 329-330, 87 S.Ct. 1209]; see Note (1970) 83 Harv.L.Rev. 648, 663.)[4]

---

[3] "All too often the 'promise of treatment has served only to bring an illusion of benevolence to what is essentially a warehousing operation for social misfits.' [Citation.]" (*United States* ex rel. *Stachulak* v. *Coughlin* (7th Cir. 1975) 520 F.2d 931, 936; see also *People* v. *Burnick, supra*, 14 Cal.3d at pp. 319-320.)

[4] In addition to the "limited duration" and "nonpunitive" nature of confinement under section 6509, the majority cite two other features as evidence of the noncriminal character of these proceedings for Fifth Amendment purposes. The majority emphasize that commitment is not *necessarily* related to criminal acts or initiated by a public prosecutor. In this case, commitment *was* in fact related to criminal acts and initiated by a prosecutor. Although the majority's statement is theoretically accurate, it is not dispositive of appellant's right not to testify. In *Thurston* v. *Clark, supra*, 107 Cal. 285, a *private individual* brought a statutory action to remove a public official from office. Under the statute, removal was not necessarily related to criminal acts, since neglect of duty (as well as ordinary criminal conduct) was actionable. (*Id.,* at p. 287.) Yet neither of these features of the action deterred the court from holding that defendant Clark had been improperly required to be a witness in the removal action against him. Thus, the majority's analysis of the "civil" nature of section 6500 proceedings, premised on four "civil" features of the action, fails on its own terms.

The majority also fail to emphasize that the state itself has recognized the serious consequences of these proceedings by affording indigent defendants a right to appointed counsel. (§ 6500.1.) Indigent civil defendants ordinarily have no such right. (*Hunt* v. *Hackett* (1973) 36 Cal.App.3d 134, 138 [111 Cal.Rptr. 456].) In addition, the trial court properly held that appellant was entitled to be proven dangerous and mentally retarded by proof beyond a reasonable doubt to the satisfaction of a unanimous jury. Finally, appellant received a free transcript on appeal, a right ordinarily reserved for criminal defendants. (See *Gardiana* v. *Small Claims Court* (1976) 59 Cal.App.3d 412, 424 [130 Cal.Rptr. 675].)

The majority's failure to confront the actual consequences of section 6500 proceedings is evident in their reliance on attorney discipline cases as authority for the unavailability of the "defendant's privilege" here. (E.g., *Black* v. *State Bar, supra,* 7 Cal.3d 676.) In *Black,* this court carefully distinguished *Gault*: "Disciplinary proceedings, however, unlike juvenile proceedings, *cannot result in incarceration* . . . ." (*Id.,* at p. 688, italics added.) In contrast, commitment proceedings *do* result in incarceration. (E.g., *People* v. *Thomas, supra,* 19 Cal.3d at p. 638.) Attorney discipline cases are not sound authority for the issue in this case.

The majority's reliance on *People* v. *Whelchel* (1967) 255 Cal.App.2d 455, 460 [63 Cal.Rptr. 258], is equally unsatisfactory. In *Whelchel,* the Court of Appeal reasoned that proceedings to commit narcotics addicts are "civil in nature" and do not result in "penal" confinement. (*Id.,* at pp. 460-461.) That analysis was categorically rejected by this court in *Thomas.* (19 Cal.3d at pp. 637-638.) The majority fail to explain the contradiction.

Instead, they summarily assert that application of the "defendant's privilege" to commitment proceedings would contravene the language and purpose of the privilege. (Maj. opn., *ante,* at p. 138.) In support, the majority state that the traditional purpose of the right not to testify "has been to assure that the *criminal* justice system remains accusatorial . . . ." (*Id.* at p. 137, italics original.) That statement simply begs the question.

The values and policies underlying the guarantee against testimonial compulsion are as operative in a commitment proceeding as in an ordinary criminal prosecution.[5] "Not only is the 'public interest' present and aligned against the subject, but it actively participates in the imposition of liability. This creates the very situation in which the privilege was designed to operate." (McCormick on Evidence, *supra,* pp. 258-259.) It is curious that the court's respect for "the inviolability of the human personality" is not offended by a proceeding in which the state is excused from having to produce the evidence against a retarded person by its own labors, and is allowed to employ "the cruel, simple expedient of compelling it from his own mouth." (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 460 [16 L.Ed.2d at p. 715].)

---

[5] It is well known, after all, that some governments have resorted to civil commitment as a means of silencing individuals who dissent, in the same way the criminal justice system *was used in* Lilburne's day to accomplish the same end. The Fifth Amendment is directly traceable to such abuses. (See generally, Levy, Origins of the Fifth Amendment (1971) ch. 9.)

The majority argue that it is permissible to compel evidence from appellant's mouth for the "nontestimonial" purpose of showing his mental state, just as it is permissible to compel voice exemplars. This analogy fails.[6] Today's holding exposes defendants in section 6500 proceedings to potentially incriminating questions. When such questions arise, these defendants will be forced either to invoke their privilege against self-incrimination in front of the jury which is judging them, or to make incriminating admissions, deliberately or unwittingly.

No one familiar with the popular meaning of the term "taking the Fifth" can doubt the prejudicial impact of the first alternative. No one familiar with the mentally retarded can doubt that the risk of inadvertent admissions is greater for them than for other defendants. Thus, today's decision places persons subject to potentially lifelong commitment under section 6500 in a dilemma even more cruel than that in which we refuse to place mentally competent defendants in ordinary prosecutions for crime.[7]

There is no compelling reason to subject persons like appellant to the serious dilemma which the "defendant's privilege" was meant to avoid. Requiring defendants to testify in these proceedings is unnecessary either to insure their treatment or to protect the public. To be committed under section 6500, a person must have been "mentally retarded from infancy or before reaching maturity . . . ." For persons who fit this description, there are sure to be numerous witnesses available to testify on the issue of retardation. Reliance on such witnesses is a perfectly sufficient and less intrusive means of fulfilling the statutory purposes.

Appellant should not have been compelled to be a witness against himself at a proceeding designed to deprive him of his freedom.

---

[6] I agree with the courts which have rejected the view that statements elicited from a defendant to determine his mental state are analogous to blood tests or voice identifications. (E.g., *Commonwealth* v. *Pomponi* (1971) 447 Pa. 154, 159 [284 A.2d 708, 710]; *Lee* v. *County Court of Erie County* (1970) 27 N.Y.2d 432, 439 [318 N.Y.S.2d 705, 267 N.E.2d 452, 456].)

[7] Further, today's ruling creates a substantial risk that unreliable testimony will be placed before the jury. If the defendant is in fact retarded, he is unlikely to comprehend either the nature of the proceedings or the consequences to himself. Such a person lacks a self-protective sense that would keep him from exaggerating his actions in order to convey an image of being "tough." Thus, in determining the defendant's dangerousness, a jury might be easily misled by unsolicited statements made more out of false bravado than out of an obligation to tell the truth.

The present case illustrates the potential dangers since the jury may well have been influenced by appellant's courtroom effort to demonstrate his prowess as a fighter.

## III

While holding that appellant could not refuse to testify altogether, the majority recognize that he did have a right not to incriminate himself, once he was called as a witness. The trial judge violated this right by requiring appellant to answer all questions. Yet the majority dismiss this error, which led to appellant's dramatic and damaging testimony, as "harmless beyond a reasonable doubt." I disagree.

The actual standard for measuring the harm caused by federal constitutional error is whether the benefiting party can show beyond a reasonable doubt that the error did not contribute to the verdict. (*Chapman* v. *California* (1967) 386 U.S. 18, 23-24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People* v. *McClary* (1977) 20 Cal.3d 218, 230 [142 Cal.Rptr. 163, 571 P.2d 620].) In *Chapman*, the Supreme Court expressed concern that in finding constitutional errors harmless, California courts might be giving too much emphasis to what they considered "overwhelming evidence" in support of the verdict. (386 U.S. at p. 23 [17 L.Ed.2d at p. 710].) The Supreme Court sought to correct this problem by focusing the inquiry on whether the error may have contributed to the verdict.

In the present case, respondent simply cannot establish beyond a reasonable doubt that the error in compelling appellant's incriminating testimony did not contribute to his being found a dangerous mentally retarded person. It is difficult to imagine an error leading to *more* harmful testimony. The assaults which appellant said he had committed showed his dangerousness. His child-like dramatizations of those assaults, complete with sound effects, demonstrated his retardation. In effect, appellant was compelled to give testimony which proved both elements of the district attorney's case. It simply cannot be said to a moral certainty that appellant's performance did not contribute to the verdict against him.

I would reverse the judgment.

NEWMAN, J., Dissenting.—I concur in the dissent of the Chief Justice except to the extent it may imply that the Fifth Amendment's privilege is identical to that set forth in article I, section 15 of the California Constitution. My position is that the trial court here violated commands of the California Constitution, which is all we need decide. Compare O'Brien, *The Fifth Amendment: Fox Hunters, Old Women, Hermits, and the Burger Court* (1978) 54 Notre Dame Law. 26.

Occasionally a jury trial may appear a little like a circus. When incarceration of allegedly dangerous persons is sought, however, courts should countenance neither witting nor unwitting attempts by prosecutors to exploit possible "freak show" prejudices. I cannot agree with the majority's conclusion that "any erroneous questioning of the appellant was harmless beyond all reasonable doubt." Nor can I agree that he properly was "required to respond to nondiscriminatory questioning which may have revealed his mental condition . . . ." What was done to him here seems cruel and degrading.[1]

We learn from the majority opinion that, in "understandable words . . . not always the same as those repeated by the interpreter . . . . Tyars admitted several acts of violence including the throwing of chairs, 'breaking someone's head wide open,' and striking a hospital technician; he also named victims of other assaults and batteries and illustrated his testimony by swinging his arms in descriptive punching motions."

That sad demonstration—in major part testimonial—was not, I believe, authorized by the precedents that appear to permit voice or handwriting identification, as well as requiring defendants "to stand, wear clothing, hold items . . . ." The potentially prejudicial impact of what was done to Mr. Tyars here seems incalculably greater.

Finally, I have found no evidence suggesting that, in proceedings like these, "[t]he Legislature has not elected to authorize consideration of the factors of medication . . . ."

Appellant's petition for a rehearing was denied February 21, 1979, and the opinion was modified to read as printed above. Bird, C. J., was of the opinion that the petition should be granted.

---

[1]See article 5 of the Universal Declaration of Human Rights: "No one shall be subjected to . . . cruel, inhuman or degrading treatment . . ."; compare my concurring opinion in *People* v. *Levins* (1978) 22 Cal.3d 620 [150 Cal.Rptr. 458, 586 P.2d 939].