[Civ. No. 41256. First Dist., Div. Two. Mar. 7, 1978.]

Conservatorship of the Person and Estate of ARTHUR J. BUCHANAN. WILLIAM H. MEYER, as Public Guardian, etc., Petitioner and Respondent, v. ARTHUR J. BUCHANAN, Objector and Appellant.

## COUNSEL

Paul N. Halvonik, State Public Defender, under appointment by the Court of Appeal, Clifton R. Jeffers, Chief Assistant State Public Defender, Michael G. Millman and Diana Baker, Deputy State Public Defenders, for Objector and Appellant.

Selby Brown, Jr., County Counsel, and Josephine T. Druehl, Deputy County Counsel, for Petitioner and Respondent.

## OPINION

**TAYLOR, P. J.**—Conservatee, Arthur Buchanan, appeals from an order entered on a jury verdict finding him "gravely disabled," as defined in Welfare and Institutions Code section 5008, subdivision (h),[1] and the appointment of the public guardian as his conservator, pursuant to section 5350,[2] with powers of hospitalization, pursuant to section 5358.[3] He contends that: 1) medical records were improperly admitted into evidence and the court failed to instruct the jury as to their limited use; 2) the trial court also improperly instructed the jury on the "gravely disabled" standard; and 3) his involuntary commitment when alternative means of care were available violated his constitutional rights, as well as the legislative intent of the Lanterman-Petris-Short Act (§ 5000 et seq.) (hereafter LPS).

At the oral argument, the record was augmented by stipulation of the parties, with a certified copy of an order indicating that during the pendency of this appeal, the conservatorship was terminated. We are, therefore, faced with a preliminary question of mootness. The instant case poses issues of public interest that are capable of repetition, yet

[1]Welfare and Institutions Code section 5008, subdivision (h) defines "gravely disabled" as: "(1) A condition in which a person, as a result of a mental disorder, is unable to provide for his basic personal needs for food, clothing, or shelter...."

Hereafter, all statutory references are to the Welfare and Institutions Code unless designated otherwise.

[2]Section 5350 is the general authorization to appoint a conservator and provides in pertinent part: "A conservator of the person, of the estate, or of the person and the estate may be appointed for any person who is gravely disabled as a result of mental disorder or impairment by chronic alcoholism."

[3]Section 5358 warrants this action only when the court specifically grants the power. "A conservator appointed pursuant to this chapter shall have the right, if specified in the court order, to place his conservatee in a medical, psychiatric, nursing, or other state-licensed facility...."

avoiding review (*Ferrara* v. *Belanger,* 18 Cal.3d 253, 259 [133 Cal.Rptr. 849, 555 P.2d 1089]). The statute involved is new; there is a paucity of authority and interpretation. In addition, collateral consequences remain even after the conservatorship has been terminated (*People* v. *Feagley,* 14 Cal.3d 338, 345 [121 Cal.Rptr. 509, 535 P.2d 373]). Accordingly, we conclude that the instant case is not moot and should be decided on its merits.[4]

Viewing the facts, as we must, in support of the order, the following appears: Mr. Buchanan, a 31-year-old black male, had a lengthy history of mental illness. During the six years preceding the instant petitions filed in 1976, the conservatee had been hospitalized on four occasions for periods of time ranging from two to six months. These proceedings were initiated in April 1976 after a police officer took Mr. Buchanan into custody after observing him on his knees in a gasoline station praying for gas on the night of April 5, 1976. Buchanan was admitted to Santa Clara Valley Medical Center (VMC), temporarily detained, and examined by several doctors. A report prepared by Drs. Arons and Woodrow recommended a conservatorship. On April 14, 1976, the public guardian was appointed temporary conservator; thereafter, the conservatorship was made permanent and one of Buchanan's sisters, Mrs. Soberanis, appointed as conservator. After her withdrawal, the public guardian was reappointed.

In January 1977, Buchanan petitioned for a rehearing, pursuant to section 5364 and demanded a jury trial on the issue of his grave disability, pursuant to section 5350, subdivision (d). At the trial, Dr. Michael Kerschenbaum, a psychiatrist, on the basis of his own examination and the medical records, opined that Buchanan was suffering from schizophrenia, evidenced by, inter alia, loose thought organization, distractibility and erratic behavior. In the opinion of this expert, Buchanan was unable to provide for his own food, shelter and clothing as a result of his illness. Dr. Kerschenbaum's diagnosis was in accord with the conservatorship report prepared for the court pursuant to section 5358. Buchanan presented no expert testimony and relied on his own testimony and that of his two sisters. Each indicated that he was not mentally ill, capable of providing his basic needs, and heard voices consistent with the family's religious upbringing and beliefs in demons, fasting and prayer.

---

[4]We have, however, eliminated the question of sufficiency of the evidence.

Buchanan first contends that the VMC medical records were improperly admitted and considered by the jury. His contention is threefold: 1) no proper foundation was laid to qualify the records for admission; 2) certain portions of the records were comprised of inadmissible hearsay, as these diagnoses were not "records of an act, condition, or event," as specified by Evidence Code section 1271, set forth below;[5] and 3) the trial court erred in refusing his proffered instruction on the limited purpose for which the records could be considered.

■ Buchanan's argument as to the foundation for the medical records cannot be considered as the record reveals that no proper objection on this ground was made below. Had such an objection been made, Dr. Kerschenbaum could have readily testified as to the manner of keeping hospital records and his acquaintance with the records here (cf. *People* v. *Terrell,* 138 Cal.App.2d 35 [291 P.2d 155]; *People* v. *Dorsey,* 43 Cal.App.3d 953 [118 Cal.Rptr. 362]). In *Dorsey, supra,* the court indicated, at page 961, that foundational requirements may be inferred from the circumstances in such a situation.

■ Buchanan's argument as to the inadmissibility of the diagnoses of other physicians in the medical records is based on Evidence Code section 1271, as interpreted by our Supreme Court in *People* v. *Reyes,* 12 Cal.3d 486 [116 Cal.Rptr. 217, 526 P.2d 225]. *Reyes* stated at page 503: " ' "It is true that some diagnoses are a statement of a fact or condition, for example, a diagnosis that a man has suffered a compound fracture of the femur is a record of what the person making the diagnosis has seen but this is not true where the diagnosis is but the reasoning of the person making it arrived at from the consideration of many different factors." ' [Citations.] A psychiatric diagnosis is especially susceptible to [this reasoning] because it is based upon the thought process of the psychiatrist expressing the conclusion." An inspection of the instant medical records reveals several different diagnoses of Buchanan as a schizophrenic emanating from various sources, chiefly the staff members of VMC.

[5]Evidence Code section 1271 provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if:

"(a) The writing was made in the regular course of a business;

"(b) The writing was made at or near the time of the act, condition, or event;

"(c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and

"(d) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

The public conservator properly relies on *Springer* v. *Reimers,* 4 Cal.App.3d 325, 338 [84 Cal.Rptr. 486], and *Kelley* v. *Bailey,* 189 Cal.App.2d 728, 738 [11 Cal.Rptr. 448], in arguing that a portion of these records was correctly admitted as a basis for Dr. Kerschenbaum's expert opinion and not as independent proof of Buchanan's illness. We agree that the portion of the records consisting of observations of Buchanan by the VMC staff was clearly admissible. Admissibility does not extend to the independent diagnoses of the out-of-court VMC psychiatrists in light of *Whitfield* v. *Roth,* 10 Cal.3d 874 [112 Cal.Rptr. 540, 519 P.2d 588]. However, the record indicates that Dr. Kerschenbaum did not rely on any diagnosis other than his own.

█ When records are admitted under the *Springer* rationale (*supra,* 4 Cal.App.3d 325), a limiting instruction need not be given, *sua sponte,* but must be given upon request of counsel (*Kelley* v. *Bailey, supra,* 189 Cal.App.2d at p. 738; Evid. Code, § 355 (see also *People* v. *Simms,* 10 Cal.App.3d 299 [89 Cal.Rptr. 1]; Witkin, Cal. Evidence (2d ed.) § 316)). Here, such an instruction was requested twice and refused. Also, in the instant case, the hearsay diagnoses of other psychiatrists could have been severed from the part of the medical record relating to the day-to-day observations of Buchanan. We conclude that the submission of the entire medical record to the jury, compounded by the refusal to give a limiting instruction, constituted an abuse of discretion and was error (*Exclusive Florists, Inc.* v. *Kahn,* 17 Cal.App.3d 711 [95 Cal.Rptr. 325]).

█ We are faced with the question of the appropriate standard of appellate review for an LPS civil commitment proceeding. The issue is recognized by each party in their briefs but not fully discussed. Predictably, the public administrator assumes that *People* v. *Watson,* 46 Cal.2d 818 [299 P.2d 243], and state Constitution article VI, section 13, are appropriate, while Buchanan assumes that the more stringent rule of *Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065], should be applied. Although our research has disclosed no prior decision on the question here presented, we find a helpful analogy in cases such as *In re Winship,* 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068]. As there indicated, the imposition of a stricter standard is preferable where, as here, the deprivation of individual liberty is involved. We conclude that the properly applicable standard is that of *Chapman, supra,* 386 U.S. 18, rather than *People* v. *Watson, supra,* 46 Cal.2d 818.

■ Applying the standard here, we note that the erroneously admitted hearsay was merely cumulative of the diagnosis of the expert. Buchanan also had the opportunity to cross-examine the expert at trial.[6] Accordingly, we conclude that the admission of the hearsay portion of the medical records was harmless beyond a reasonable doubt (*Chapman* v. *California, supra,* 386 U.S. 18; cf. *People* v. *Leach,* 15 Cal.3d 419, 446-447 [124 Cal.Rptr. 752, 541 P.2d 296]).

■ Buchanan next contends that the trial court improperly refused his proffered instruction that one is not gravely disabled if capable of surviving with the help of willing relatives, friends or other third parties.[7] We believe that the trial court properly instructed the jury as to this matter in light of the language of section 5008, subdivision (h)(1), as interpreted by this court in *Conservatorship of Chambers,* 71 Cal.App.3d 277 [139 Cal.Rptr. 357].

Section 5008, subdivision (h)(1), quoted above at footnote 1, defines gravely disabled as a condition in which the prospective conservatee is unable to provide for his basic personal needs as a result of a mental disorder. There is no language in the statute to indicate that where third parties can provide the basic necessities of life that no "grave disability" exists. In *Chambers, supra,* 71 Cal.App.3d 277, this court upheld the constitutionality of the statutory definition, and stated at page 284: "It [the term gravely disabled ] connotes an inability or refusal *on the part of the proposed conservatee* to care for basic personal needs of food, clothing and shelter. It also provides *fair notice of the proscribed conduct to the proposed conservatee* who must be presumed to be a person of common intelligence for the purpose of determining the sufficiency of the statute." (Italics added.) We conclude that the pertinent inquiry on the issue of grave disability is whether the conservatee *himself* is able to provide for his basic needs and not, as Buchanan maintains, whether he can do so with the assistance of third parties.[8]

---

[6]We see no merit in the contention that other portions of the medical report were inaccurate as to the precise length of Buchanan's prior commitments and stays at various facilities. Although his sister indicated she may have unwittingly provided erroneous information, the significant factor is the number of his commitments rather than the precise duration of each.

[7]The refused instruction read as follows: "One is not gravely disabled either if he/she is capable of surviving on his/her own or with the help of willing and responsible third parties. Such third parties include relatives, friends, community agencies, and board and care facilities."

[8]Helpful on this question is our Supreme Court's discussion of section 5008, subdivision (h)(1) in *In re Michael E.,* 15 Cal.3d 183 [123 Cal.Rptr. 103, 538 P.2d 231],

■ Buchanan urges that the legislative intent of the LPS, expressed in section 5001, set forth below,[9] compels an instruction which incorporates the factor of third party aid. We cannot agree. In fact, a review of chapter 3 of the LPS (§ 5350 et seq.) indicates the opposite intention. Section 5350 adopts the procedures of division 5 of the Probate Code (§ 1701 et seq.) for the institution of conservatorships. Section 5350 grants an individual a trial by court or jury on the sole issue of his grave disability. The sole discretion as to the appointment of a conservator and the course of treatment to be followed is vested in the court (Prob. Code, § 1753), guided by the best interests of the proposed conservatee (Prob. Code, § 1752). We see in the structure and scheme of the LPS a purposeful separation of the adjudication and placement of the gravely disabled person. The proposed instruction would not only confuse the trier of fact as to its proper role, but infringes upon the powers reserved by statute to the court's discretion, namely, the course of treatment. Accordingly, we conclude that the proffered instruction was properly refused and the jury was correctly instructed on the "grave disability."

Buchanan further argues that the trial court's action in involuntarily committing him by use of the conservatorship statutes *violates his constitutional right to liberty,* where it is shown that he can safely survive in society with the aid of third persons. He relies on *O'Connor* v. *Donaldson,* 422 U.S. 563 [45 L.Ed.2d 396, 95 S.Ct. 2486]. In *O'Connor, supra,* at page 576 [45 L.Ed.2d at page 407], the U.S. Supreme Court held

---

which held that LPS standards must be applied when a minor is to be civilly committed (p. 189). The court there indicated that in the case of a minor where the parents are legally responsible for the provision of basic needs (Civ. Code, § 242), the parents' responsibilities are to be disregarded by the trier of fact, and the minor's personal ability alone is to be adjudicated. Similarly here, where there is no statutory requirement that a willing third party provide for the needs of an individual, the inquiry of the trier of fact is directed to the narrow issue of the subject's unaided ability to care for himself.

[9]Section 5001 states in full: "The provisions of this part shall be construed to promote the legislative intent as follows:

"(a) To end the inappropriate, indefinite, and involuntary commitment of mentally disordered persons and persons impaired by chronic alcoholism, and to eliminate legal disabilities;

"(b) To provide prompt evaluation and treatment of persons with serious mental disorders or impaired by chronic alcoholism;

"(c) To guarantee and protect public safety;

"(d) To safeguard individual rights through judicial review;

"(e) To provide individualized treatment, supervision, and placement services by a conservatorship program for gravely disabled persons;

"(f) To encourage the full use of all existing agencies, professional personnel and public funds to accomplish these objectives and to prevent duplication of services and unnecessary expenditures."

that "a State cannot constitutionally confine *without more* a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends" (italics added). The court concluded (at p. 575 [45 L.Ed.2d at pp. 406-407]) that there was no justification for the confinement of an individual on the mere finding of a "mental illness" *without appropriate treatment. O'Connor, supra,* is inapposite, as it did not reach the specific question here presented, namely, the power of a state to confine an individual for meaningful treatment.

■ Finally, Buchanan contends that his involuntary commitment in a medical facility when alternative means of care are available, is contrary to the legislative expressions of intent set out in section 5001, quoted *ante,* at footnote 9, page 290, and section 5120, set forth below.[10] He argues that these provisions compel the court to place an individual adjudged gravely disabled in a community-based facility or with relatives and friends (§ 5358) in lieu of an institutional commitment whenever one of the former alternatives is available. We do not agree.

The LPS was adopted to end the inappropriate, indefinite and involuntary commitment of mentally disordered persons (§ 5001, subd. (a); see also *Civil Commitment of the Mentally Ill in California: 1969 Style* (1969) 10 Santa Clara Law. 74). Thus, the Legislature proposed to eliminate the unnecessary incarceration of mentally ill patients when they are unharmful to themselves and society and where confinement is not in their best interests. We cannot view this purpose to mean that hospital placement is never to be used whenever alternative means are available. Such a contention is directly contrary to the legislative intent expressed in section 5001, subdivisions (e) and (f), set forth *ante,* in footnote 9, at page 290, that respectively mandate "individualized treatment" and encourage "the full use of all existing agencies." Presumably, the latter phrase includes hospitals.

Buchanan correctly points to the various preferences and priorities established by LPS for local treatments (§§ 5358, 5120) and placement with relatives. However, the application of these preferences and priorities is to be determined in the light of the overriding governing principle which should guide the court in its selection of a conservator, namely, the best interests of the conservatee (§ 5350; Prob. Code, § 1752;

---

[10]Section 5120 states in pertinent part: "It is the policy of this state as declared and established in this act and in the Lanterman-Petris-Short Act that the care and treatment of mental patients be provided in the local community."

see also *Guardianship of Brown*, 16 Cal.3d 326 [128 Cal.Rptr. 10, 546 P.2d 298]).

After carefully reviewing the record, we can only conclude that the trial court did not abuse its discretion in appointing the public guardian conservator. The court had before it not only the testimony of the expert witness, Buchanan and his sisters, but also the conservatorship report compiled pursuant to section 5358. The report noted that Buchanan's prior placements with members of his family had not been successful and recommended the appointment of the public guardian and hospitalization. The record further indicates that the court considered the alternative of placing Buchanan with his other sister, Mrs. Stewart. However, at the conclusion of Mrs. Stewart's testimony, the court concluded that she had no "concept of the problems the man is suffering from." -

The record thus reveals a careful consideration of the alternative of family treatment by the trial court. As indicated above, Buchanan's other sister, Mrs. Soberanis, withdrew as his conservator. In absence of an abuse of discretion granted to the trial court in these matters, we are powerless to upset its determination (*Guardianship of Brown, supra,* 16 Cal.3d at p. 336).

For the reasons set forth above, the judgment of grave disability and the appointment of the public conservator are affirmed.

Kane, J., and Rouse, J., concurred.

A petition for a rehearing was denied April 6, 1978, and appellant's petition for a hearing by the Supreme Court was denied May 4, 1978. Bird, C. J., and Newman, J., were of the opinion that the petition should be granted.