[Civ. No. 61112. Second Dist., Div. Four. Oct. 6, 1981.]

Conservatorship of the Person and Estate of MARY DAVIS.
GORDON W. TREHARNE, as Public Guardian, etc., Petitioner and
Appellant, v.
MARY DAVIS, Objector and Respondent.

**COUNSEL**

John H. Larson, County Counsel, and Jonathan B. Crane, Deputy County Counsel, for Petitioner and Appellant.

William Littlefield, Public Defender, Dennis H. Fischer, Jill Lansing and Leighton A. Nugent, Deputy Public Defenders, for Objector and Respondent.

Quin Denvir, State Public Defender, Paul D. Fogel, State Deputy Public Defender, James J. Preis and Nancy M. Shea as Amici Curiae on behalf of Objector and Respondent.

**OPINION**

McCLOSKY, J.—Gordon W. Treharne, appellant, acting in his capacity as Public Guardian for Los Angeles County, sought by petition to establish a Lanterman Petris Short (LPS)[1] conservatorship and a temporary conservatorship with the power, among others, to involuntarily confine in a hospital respondent Mary Davis, a person claimed to be gravely disabled as a result of a mental disorder.

By temporary letters of conservatorship appellant was appointed the temporary conservator of respondent pending the hearing on the petition for conservatorship.

Following a jury trial which resulted in a unanimous jury verdict finding that: "MARY DAVIS is not gravely disabled" the trial court ordered the petition dismissed, respondent released from any involuntary treatment, and appellant discharged as conservator. It is from that order of dismissal (judgment) that appellant appeals.

STATEMENT OF FACTS

Respondent was a 39-year-old woman who had been married 18 years at the time the petition was filed. She and her husband had lived together all of those 18 years except for the periods of 4 psychiatric hospitalizations commencing October 1978. About seven years before the trial respondent's husband noticed that his wife had "begun to change," resigning her job because she felt her coworkers were talking about her behind her back. Shortly after that he observed a diminution in her ability to cook, drive a car, and handle funds responsibly. She became delusional and her eating, sleeping and certain other habits changed and became grossly bizarre.

Notwithstanding these problems known to him, her husband testified at the trial that he is willing to have respondent live at his home and that she would definitely be welcome at their family home if she returned to it.

Dr. Jones, a psychiatrist responsible for her treatment during two of respondent's hospitalizations, testified that appellant suffers from

---

[1]Lanterman-Petris-Short Act is found in Welfare and Institutions Code sections 5001 et seq. All statutory references herein are to the Welfare and Institutions Code unless otherwise indicated.

chronic paranoid schizophrenia, a mental disorder which, he opined, caused respondent to be unable to provide herself with food, clothing and shelter, or to followup on (a plan of) treatment. While he held the opinion that she is not cured or in remission, he stated that her symptoms were being controlled by antipsychotic medications which she was willingly taking at the hospital. She was in an open ward of the hospital where she could leave if she wanted to but had never attempted to do so. She told Dr. Jones that she would continue to take her medicine at home. Dr. Jones felt she was sincere, but had grave doubts as to whether she would be able to continue "to feel that way."

Another psychiatrist, Dr. Sharma, testified at the trial that he had evaluated respondent and her medical records for the purpose of determining whether she was gravely disabled. In his opinion she was mentally ill but not gravely disabled. He formed this opinion on the basis that she understood that she was mentally ill and had problems, although she now believed she was doing well; that she thought her medication was helping her and wanted to continue taking it, even if released from the hospital, at least until her doctor believed she was well enough to do without it. She was able to answer all of Dr. Sharma's questions pertaining to food, clothing and shelter in a manner he would expect them to be answered by a person not gravely disabled and who would be able to provide those necessities. Respondent told Dr. Sharma she did not work and that her husband had been supporting her for at least two or three years.

Dr. Sharma concluded, from the answers given by respondent to his questions, that respondent was not working because she was a housewife, just as many other housewives do not work, rather than as as a result of her mental illness. He testified that he believed that respondent was willing and able to accept voluntary treatment including medication if necessary. Dr. Sharma learned from respondent and from his review of her hospital chart that she had taken her medication at home on her last three weekend home visits, and had not refused it while a patient at the hospital. In his opinion she had made substantial improvement since she entered the hospital. At the time he interviewed her she was dressed adequately, and wearing clothing appropriate for the weather. He felt that if she discontinues taking her medication after a period of time of a few months or years, she would probably have another psychiatric breakdown.

Respondent testified that the reason she had stopped taking a different medication on the occasion of an earlier release from the hospital was because of its side effect, which made her feel she had to "walk a lot." The medication she is now taking does not have that effect. She feels well taking this present medication and will continue to take it as long as the doctor thinks it is necessary which she feels is reason enough for her to do so. She testified to the meals she had consumed during the past year, as to her personal care, and that she had washed her hair, cooked, and gone to the market the day before her testimony. She also testified to her grocery shopping, cooking and clothes buying habits.

No contention is made by either party that respondent is dangerous to either herself or others, or that she is a person coming within the provisions of section 5008, subdivision (h)(2) by reason of having been found mentally incompetent under section 1370 of the Penal Code.

## DISCUSSION

*Did the Trial Court Commit Prejudicial Error by Giving the Jury Respondent's Proposed Jury Instructions Number 2 and 2a and Refusing to Give Petitioner's Requested Instruction Number 8*

Over appellant's objection, the trial judge gave respondent's proposed jury instruction numbers 2 and 2a, hereinafter sometimes "2" and "2a" respectively, and refused to give appellant's requested instruction number 8, hereinafter sometimes "8."

Respondent's 2a reads as follows: "You are instructed that if you find that Mary Davis is capable of surviving safely in freedom by herself or with the help of willing and responsible family members or friends you shall find that she is not gravely disabled."

Respondent's 2 reads as follows: "You are instructed that before you may consider whether Mary Davis is gravely disabled you must first find that she is, as a result of a mental disorder, unwilling or unable to accept treatment for that mental disorder on a voluntary basis. If you find that Mary Davis is capable of understanding her need for treatment for any mental disorder she may have and capable of making a meaningful commitment to a plan of treatment of that disorder she is entitled to a verdict of 'not gravely disabled.'"

Appellant's 8 reads as follows: "The fact that respondent's family is or is not amenable to having respondent reside in their home is not determinative of whether respondent is capable of providing herself with food, clothing or shelter."

Appellant contends that by giving instructions numbered 2 and 2a and by refusing to give number 8, the trial court committed prejudicial error. He bases his contentions on the holding in *Conservatorship of Buchanan* (1978) 78 Cal.App.3d 281 [144 Cal.Rptr. 241], and on the argument that the trial judge's rulings regarding these three instructions added an additional element to appellant's case.

In pertinent part Welfare and Institutions Code section 5008, subdivision (h) defines "gravely disabled" as: "(1) A condition in which a person, as a result of a mental disorder, is unable to provide for his basic personal needs for food, clothing, or shelter . . . ."

In *Buchanan, supra*, 78 Cal.App.3d 281, the First District, Division Two of the Court of Appeal reasoned that because this statute contains no language indicating that where third parties can provide the basic necessities of life no "grave disability" exists, a trial court did not err in refusing to instruct a jury that "One is not gravely disabled either if he/she is capable of surviving on his/her own or with the help of willing and responsible third parties. Such third parties include relatives, friends, community agencies, and board and care facilities."

In reaching this conclusion the *Buchanan* court rejected the contention that the legislative intent of the LPS, expressed in section 5001, compelled an instruction incorporating the factor of third party aid, stating: "We cannot agree. In fact, a review of chapter 3 of the LPS (§ 5350 et seq.) indicates the opposite intention. Section 5350 adopts the procedures of division 5 of the Probate Code (§ 1701 et seq.) for the institution of conservatorships. Section 5350 grants an individual a trial by court or jury on the sole issue of his grave disability. The sole discretion as to the appointment of a conservator and the course of treatment to be followed is vested in the court (Prob. Code, § 1753), guided by the best interests of the proposed conservatee (Prob. Code, § 1752). We see in the structure and scheme of the LPS a purposeful separation of the adjudication and placement of the gravely disabled person. The proposed instruction would not only confuse the trier of fact as to its proper role, but infringes upon the powers reserved by statute to the court's discretion, namely, the course of treatment. Accordingly, we

conclude that the proffered instruction was properly refused and the jury was correctly instructed on the 'grave disability.'" (*Conservatorship of Buchanan, supra*, 78 Cal.App.3d 281, 290.)

For reasons we shall set forth, we disagree with the *Buchanan* court's conclusion.

Because our analysis of this issue involves the proper interpretation of section 5008, subdivision (h)(1), we are guided by the general principles of statutory construction aptly summarized by our Supreme Court in *Moyer v. Workmen's Compensation Appeals Bd.* (1973) 10 Cal.3d 222, 230-231 [110 Cal.Rptr. 144, 514 P.2d 1224]: "We begin with the fundamental rule that a court 'should ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citation.] In determining such intent '[t]he court turns first to the words themselves for the answer.' [Citation.] We are required to give effect to statutes 'according to the usual, ordinary import of the language employed in framing them.' [Citations.] 'If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose.' [Citation.] '[A] construction making some words surplusage is to be avoided.' [Citation.] 'When used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear.' [Citations.] Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole." (See also *Tripp v. Swoap* (1976) 17 Cal.3d 671, 679 [131 Cal.Rptr. 789, 552 P.2d 749] and *People v. Untiedt* (1974) 42 Cal.App.3d 550, 554 [116 Cal.Rptr. 899].)

■ Application of these principles to the case before us leads us to the conclusion that a person is not "gravely disabled" within the meaning of section 5008, subdivision (h)(1) if he or she is capable of surviving safely in freedom with the help of willing and responsible family members, friends or third parties.

The analysis upon which this conclusion is based begins with the ascertainment of the intent with which the Legislature enacted the Lanterman-Petris-Short Act. As stated in section 5001 of the act that intent is:

"(a) *To end the inappropriate, indefinite, and involuntary commitment of mentally disordered persons*, developmentally disabled persons,

and persons impaired by chronic alcoholism, *and to eliminate legal disabilities*;

"(b) To provide prompt evaluation and treatment of persons with serious mental disorders or impaired by chronic alcoholism;

"(c) To guarantee and protect public safety;

"(d) *To safeguard individual rights through judicial review*;

"(e) To provide individualized treatment, supervision, and placement services by a conservatorship program for gravely disabled persons;

"(f) To encourage the full use of all existing agencies, professional personnel and public funds to accomplish these objectives and *to prevent* duplication of services and *unnecessary expenditures*;

"(g) To protect mentally disordered persons and developmentally disabled persons from criminal acts. [Italics added.]"

Next, looking to the various parts of the act for the purpose of harmonizing section 5008, subidivision (h)(1) in the context of the statutory framework as a whole, we note that section 5352[2] provides that a petition to establish a conservatorship shall be filed only after a preliminary determination has been made that the person is gravely disabled as a result of mental disorder *and* is unwilling, or incapable of accepting, treatment voluntarily.

---

[2]Section 5352 provides: "When the professional person in charge of an agency providing comprehensive evaluation or a facility providing intensive treatment determines that a person in his care is gravely disabled as a result of mental disorder or impairment by chronic alcoholism and is unwilling to accept, or incapable of accepting, treatment voluntarily, he may recommend conservatorship to the officer providing conservatorship investigation of the county of residence of the person prior to his admission as a patient in such facility. . . .

"If the officer providing conservatorship investigation concurs with the recommendation, he shall petition the superior court in the county of residence of the patient, pursuant to Probate Code Sections 1754 and 2051, to establish conservatorship.

"Where temporary conservatorship is indicated, the fact shall be alternatively pleaded in the petition filed under Probate Code Section 1754. The officer providing conservatorship investigation or other county officer or employee designated by the county shall act as the temporary conservator.

"The procedure for the establishment of conservatorship shall be pursuant to Probate Code Section 1751."

Section 5354[3] provides that conservatorship shall be recommended to the court *only* if no suitable alternatives are available, and requires that the report recommending conservatorship include all relevant aspects of the person's family, vocational and social condition. Significantly, this section specifies that the court may receive in evidence and consider the contents of this report in deciding whether to establish a conservatorship.

Section 5350, subdivision (d) provides in pertinent part that "... the person for whom a conservatorship is sought shall have the right to demand a court or jury trial on the issue of whether he is gravely disabled."

Nowhere in the act has the Legislature expressed any purpose or intent that the contents of the report, including the person's family or social condition, should be excluded from evidence received for consideration by the trier of fact if the case is tried to a jury rather than a judge.

Thus, although section 5350 states that the issue at trial is "whether [the person] is gravely disabled," it appears from a reading of the entire act that this phrase must be broadly construed to include the determination of whether the establishment of a conservatorship is necessary in light of all the relevant facts.

This conclusion is required not only by the principles of statutory construction which we have previously reviewed, but is compelled by the constitutional due process clause of the Fourteenth Amendment to the federal Constitution, and by article I, sections 7, subdivision (a) and 16 of the California Constitution.

---

[3]Section 5354 provides: "The officer providing conservatorship investigation shall investigate all available alternatives to conservatorship and shall recommend conservatorship to the court only if no suitable alternatives are available. The report to the court shall be comprehensive and shall contain all relevant aspects of the person's medical, psychological, financial, family, vocational and social condition, and shall contain all available information concerning the person's real and personal property. The facilities providing intensive treatment or comprehensive evaluation shall disclose any records or information which may facilitate the investigation. If the officer providing conservatorship investigation recommends against conservatorship, he shall set forth all alternatives available. A copy of the report shall be transmitted to the individual who originally recommended conservatorship, to the person or agency, if any, recommended to serve as conservator, and to the person recommended for conservatorship...."

The California Supreme Court has held that jury unanimity and proof beyond a reasonable doubt are required in LPS proceedings because "the interests involved in civil commitment proceedings are no less fundamental than those in criminal proceedings and ... liberty is no less precious because forfeited in a civil proceeding than when taken as a consequence of a criminal conviction." (*In re Gary W.* (1971) 5 Cal.3d 296, 307 [96 Cal.Rptr. 1, 486 P.2d 1201]; *People* v. *Feagley* (1975) 14 Cal.3d 338, 351 [121 Cal.Rptr. 509, 535 P.2d 373].) "Indeed, a conservatee may be subjected to greater control of his or her life than one convicted of a crime" (*Conservatorship of Roulet* (1979) 23 Cal.3d 219, 228 [152 Cal.Rptr. 425, 590 P.2d 1]) and the stigma of a civil commitment ""could be as socially debilitating as that of a criminal conviction."" (*Id.*, at p. 229.)

Thus, although neither of the provisions of the California Constitution guaranteeing due process (art. I, § 7, subd. (a)) and a unanimous jury verdict (art. I, § 16) apply by their terms to civil actions, the California Supreme Court, after closely analyzing "the severe consequences for an individual's liberty of commitment to a mental hospital as a gravely disabled person," held that both are required in civil commitment proceedings under the LPS Act. (*Conservatorship of Roulet, supra*, at pp. 231-232.)

*Roulet* and the cases cited in it make clear that the civil nature of grave disability proceedings is an insufficient excuse for allowing a person to lose his liberty and good name at the hands of less than a unanimous jury and is entitled to a standard of proof beyond a reasonable doubt (see *Roulet, supra*, at p. 231). A fortiori the nondangerous person proposed for an LPS conservatorship subject to involuntary confinement should be, and is, entitled to a jury determination of all of the essential questions involved in a trial on the question of imposing such a conservatorship.

If we were to accept appellant's contention and the conclusion of the *Buchanan* court that the "sole issue" to be tried by a jury is that of whether the person is "gravely disabled," in the narrow sense of being able to provide food, shelter, or clothing unaided by willing, responsible family, friends or others, we would seriously infringe upon the due process rights to which the proposed conservatee is entitled. To do so would violate the cornerstone of statutory interpretation which requires courts, whenever possible to interpret statutes so as to preserve their constitutionality. (See, e.g., *Kash Enterprises, Inc.* v. *City of Los Angeles*

(1977) 19 Cal.3d 294, 305 [138 Cal.Rptr. 53, 562 P.2d 1302], and *Roulet, supra*, 23 Cal.3d, fn. 9 at p. 231.)

While we agree with the *Buchanan* court that the structure of the LPS Act provides for a purposeful separation of the adjudication and placement of the gravely disabled person, we differ from *Buchanan* in that we determine the need for an LPS conservator of a nondangerous individual is part of the adjudication process. This determination is to be made by the trial judge or jury on the timely demand of the person for whom the conservatorship is proposed. The placement of the conservatee is made after LPS conservatorship is imposed in accordance with section 5358 and its subdivisions and provides (§ 5350 subd. (c)) for the placement in the least restrictive alternative placement. That is a very different and distinct matter from the adjudication part of the process, and may not be confused with it, constitutionally or under the terms of the LPS Act.

Sections 5001 et seq., necessarily require the trier of fact (the jury in the case at bench) to determine the question of grave disability, not in a vacuum, but in the context of suitable alternatives, upon a consideration of the willingness and capability of the proposed conservatee to voluntarily accept treatment and upon consideration of whether the nondangerous individual is capable of surviving safely in freedom by himself or with the help of willing and responsible family members, friends or other third parties. (See *O'Connor v. Donaldson* (1975) 422 U.S. 563, 573-576 [45 L.Ed.2d 396, 405-407, 95 S.Ct. 2486].)

*O'Connor v. Donaldson, supra*, at page 576 [45 L.Ed.2d at page 407], establishes that "... a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends." *Buchanan* and appellant infer that the term "without more" should be construed to mean "without offering treatment." We do not so read it and conclude that it is constitutionally impermissible in a civil commitment or LPS conservatorship proceeding not involving the commission of a crime, to impose such conservatorship, or to deprive any such nondangerous individual of his or her freedom where that person is capable of surviving safely in freedom even with the help of willing, responsible family or friends.

Neither the legislative purposes nor the express words of the LPS statutory enactment, taken individually or in the context of the whole act, require that a nondangerous, mentally disordered person, must either survive in society unaided by willing relatives, friends, or appropriate third persons who stand ready to provide such aid, on peril of having the public guardian or some other person appointed the guardian of his or her person and estate, with the power of involuntary hospitalization.[4] Taken together with the state and federal constitutional guarantees, these provisions compel the rejection of appellant's view of the restricted function of the jury at a conservatorship trial. The legislative focus of the LPS Act is on protecting the nondangerous gravely disabled person and allowing that person to live safely in freedom or the least restrictive alternative if he or she can do so, with or without the aid of appropriate others; it is not to force the person proposed for conservatorship to pass a theoretical test of ability to survive and provide necessities alone where there are in fact willing, responsible family, friends and others ready to help. Nor is it to allow the appointment of the public guardian or any other person, no matter how benevolent, as conservator of that person unless it is absolutely necessary to do so. The act thus takes cognizance of the very short step it is from the appointment of a conservator to the involuntary confinement or commitment of the conservatee.

As *Roulet, supra,* 23 Cal.3d 219, 225 points out: "The law must still strive to make certain that only those truly unable to take care of themselves are being assigned conservators under the LPS Act and committed to mental hospitals against their will. As Justice Brandeis cautioned a half-century ago, 'Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficient. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rules. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding.' (*Olmstead* v. *United States* (1928) 277 U.S. 438, 479 [72 L.Ed. 944, 957, 48 S.Ct. 564, 66 A.L.R. 376] (dis. opn. of Brandeis, J.).)"

Furthermore, appellant's contention that "...[t]he LPS Act unambiguously limits a jury's inquiry into whether the respondent is, as a result of a mental disorder, incapable of providing herself with food, clothing or shelter, or alternately whether the elements of WIC section

---

[4]Which appellant sought by his petition.

5008, subdivision (h)(2)[5] are met," is inconsistent with his presentation of evidence in the trial court.

Apparently recognizing the necessity of presenting to the jury all factors relevant to its determination of respondent's "grave disability" for LPS conservatorship purposes, appellant presented evidence, in the presence of the jury by the testimony of Deputy Public Guardian Sue Ratliff. She testified on appellant's counsel's direct examination that she was employed by the public guardian as the LPS conservatorship investigator who investigated this case. He asked Miss Ratliff, in the presence of the jury he now contends was sitting on the sole narrow issue of "grave disability," to explain what an LPS conservatorship is, in the following words:

"Q. [By Mr. Crane, deputy county counsel] What is the Lanterman-Petris-Conservatorship?

"A. The Lanterman-Petris-Conservatorship is the conservatorship that basically says that a person is gravely disabled due to a mental disorder, and unable to provide his or her food, clothing, or shelter, and is unable or unwilling to accept treatment voluntarily."

On continued questioning by appellant's counsel in the jury's presence about her investigation she explained that she therefore looks into the question of the patient's ability to accept treatment voluntarily to see whether a conservatorship was required; that respondent's plan for providing for herself was to return home to her family, that she was depending on her husband for her necessities, and that she would take her medicine if she returned home. Ms. Ratliff testified further that at the time she interviewed respondent, the latter was neatly dressed, alert and oriented.[6]

---

[5]The citation of section 5008, subdivision (h)(2) has to do with prospective conservatees who have been found mentally incompetent under section 1370 of the Penal Code, which was not true in the case at bench. It is thus inapposite to the issues presented in this appeal, and requires no further discussion.

[6]Appellant's conduct in eliciting that testimony in the jury's presence is inconsistent with his present contention that the jury was entitled to consider and pass only on the sole issue of grave disability, in the narrow sense that that term purportedly means that she, unaided by any others, be able to provide food, shelter or clothing for herself.

These inconsistent positions may perhaps be explained by the apparent practice of the Los Angeles Superior Court explained by the comments of the trial judge who pointed out to counsel that if the *Buchanan* rule were followed, a conservator would always be appointed where a prospective conservatee could not himself provide for his

These investigative actions, which are required by sections 5352 and 5354, were the basis of the report which, by specific language in section 5354, may be admitted into evidence and considered by the trier of fact. Just as the report may be received in evidence and considered, so may testimony by the person who prepared it or under whose direction it was prepared, as to the relevant investigatory matter and recommendation covered by it.

It follows that once such testimony was received in evidence, it (and the report, had it been received in evidence) could and should have been considered by the jury as trier of fact in reaching its verdict as to "grave disability." Similarly, if the case had been tried without a jury that evidence could and should have been considered by the trial judge as trier of fact.

Appellant contends that part of the legislative scheme of the LPS Act is to delegate to the medical profession for a short period of time up to 17 days prior to the appointment of the LPS conservator the decision making as to whether a person should be involuntarily confined (subject to review by habeas corpus) based on whether "the medical profession" determines the person is gravely disabled. Appellant then goes on to state "The logic behind this *delegation of decision-making authority is based upon* exigent circumstances and the short period of time involved." (Italics added.) The appellant continues "When the doctor feels unable to proceed further with voluntary treatment and a Section 5352 referral is made, *another delegation of decision-making authority* occurs. The county officer providing conservatorship investigation is authorized to investigate the need for conservatorship, including the question of whether there exists any suitable alternative to conservatorship (WIC section 5354) the nonexistence of which is prerequisite to a recommendation of conservatorship.... The investigator's recommendation *for* conservatorship is, of course, subject to proof as to grave disability." (Italics added.)

---

own food, shelter or clothing even though that person had a relative, a priest or another third person willing to help the individual provide those necessities. He pointed out, however, that when these people are incapable of providing for their own needs unaided by third persons, but can do so with the help of those third persons: "..., we dismiss those cases daily, I think appropriately so. Not only what we do, but perceive the philosophical plan of legislative intent here that most people shouldn't have to be under a conservatorship if you have someone who will take them home and take care of them, take them to the doctor or monitor them or whatever...."

We reject in its entirety appellant's contention that the LPS Act provides, contemplates or accomplishes any delegation of judicial decision making authority. (See Fourteenth Amend. of the U.S. Const. and article I, sections 7, subd. (a) and 16 of the Cal. Const.)

The investigation, evaluation and recommendations provided in the LPS Act are not delegations of or deletions from, judicial decision-making authority but are ancillary to it. The trier of fact, at the conservatorship trial, be it judge or jury, must take them into consideration in making its determination of grave disability and the need for an LPS conservatorship, when such recommendation is made.

■ We accordingly hold that a person sought to be made an LPS conservatee subject to involuntary confinement in a mental institution, is entitled to have a unanimous jury determination of all of the questions involved in the imposition of such a conservatorship, and not just on the issue of grave disability in the narrow sense of whether he or she can safely survive in freedom and provide food, clothing or shelter unaided by willing, responsible relatives, friends or appropriate third persons.

■ These questions which the nondangerous person proposed for such conservatorship is entitled to have considered by the jury were included in instructions 2 and 2a which the court gave the jury. We accordingly hold that the trial court committed no prejudicial error in giving those two instructions. Respondent contends that the trial judge erred in refusing to give appellant's requested instruction number 8. To the extent that it is correct, it was adequately covered by respondent's requested instruction No. 1.[7] The trial judge committed no prejudicial error in refusing to give appellant's requested instruction number 8.

---

[7] Respondent's requested instruction number 1, which was given by the court reads as follows: "You are instructed that the term 'gravely disabled' means a condition in which a person, as a result of a mental disorder, is unable to provide for his basic personal needs for food, clothing or shelter. The ability to provide for these basic needs requires more than the physical and mechanical ability to do certain acts; it means that the person be able to function and maintain himself with or without the assistance of other available resources. However, he need not necessarily be financially capable of self-support; he need only be aware of the social services and resources available to him, and capable of applying any income he receives, regardless of source, to provide for his basic personal needs.

"Psychosis, bizarre behavior, delusions or hallucinations are by themselves insufficient to justify establishment of a conservatorship, unless you find that because of one

Respondent moves us to dismiss the appeal on the ground that an appeal does not lie from the jury verdict finding respondent not gravely disabled, which, she contends must be regarded as the functional equivalent of an acquittal of a criminal offense for double jeopardy and due process purposes. We decline to do so.

Since we affirm the judgment of dismissal of the trial court we need not, and do not extensively, discuss respondent's contention that the jury verdict must be regarded as the functional equivalent of an acquittal of a criminal offense for the purposes of double jeopardy, or due process.

Neither mental disorder nor grave disability is a crime. The purposes of penal statutes and of the LPS Act are, of course, entirely different. The continuing comparison in many grave disability cases between such mental disorder or grave disability status on the one hand, and criminality or penal confinement on the other hand, is sometimes necessary, for the individual's loss of freedom is often involved in each. In cases involving the violation of statutes with penal provisions such loss of freedom is consistent with legitimate state purposes, including among others, punishment. (See Pen. Code, § 1170, subd. (a)(1).) In LPS grave disability, nondangerous person cases, not involving crimes, it is not, for as we have seen, the LPS Act seeks to avoid unnecessary and inappropriate confinement of such persons where possible. The invidious comparison to criminality and to criminal cases should, in our opinion be avoided where it can be without doing violence to the rights of the individual and to the people of the state. This appears to be such a case.

It must be recognized, however, that a judicial determination at a conservatorship trial that a person does not then need a conservator does not bar a petition for one in the future if the individual upon whom a conservatorship is sought to be imposed undergoes future changes or is subject to familial or other changes which would require the imposition of a conservatorship for the protection of that person or of society. To speak in terms of double jeopardy as a bar in the face of such possible future changes would be singularly inappropriate to the purposes and provisions of the LPS Act.

or more of these, he is unable to provide for his basic personal needs for food, clothing, or shelter.

"To find that the respondent is gravely disabled, due to a mental disorder, you must find that such condition exists at the present time, and not at some past or future date."

Respondent's motion to dismiss the appeal is denied. The order (judgment) of dismissal is affirmed.

Kingsley, Acting P. J., and Woods, J., concurred.