[Civ. No. 27646. Fourth Dist., Div. Two. Mar. 22, 1984.]

Conservatorship of the Person and Estate of ROBERT BABER.
BILL HILL, as Conservator, etc., Petitioner and Appellant, v.
ROBERT BABER, Objector and Respondent.

**COUNSEL**

Alan K. Marks, County Counsel, Dawn Stafford and Charles J. Larkin, Deputy County Counsel, for Petitioner and Appellant.

James R. Jenner, Public Defender (Alameda), Austin F. Rinella and David M. Safer, Assistant Public Defenders, Quin Denvir, State Public Defender, and Anna Javanovich, Deputy State Public Defender, as Amici Curiae on behalf of Petitioner and Appellant.

Lawson & Hartnell and Bryan C. Hartnell for Objector and Respondent.

## OPINION

## MORRIS, P. J.—

### FACTS

Respondent, Robert Baber, was found to be gravely disabled[1] as defined in the Lanterman-Petris-Short Act (Act or LPS Act). (Welf. & Inst. Code, § 5008, subd. (h)(1).)[2] Accordingly, the Public Guardian of San Bernardino County, petitioner herein, was appointed as conservator to care for his "person and estate." Robert was subsequently placed in Sierra Vista Sanitorium, a mental health facility, for involuntary treatment. After one year elapsed, the public guardian filed this petition for reestablishment of conservatorship.[3] Robert was given a jury trial. The jury held that Robert was not "gravely disabled" within the meaning of the Act. The petitioner appealed.

Petitioner contends that in giving the jury instructions the trial court gave an incorrect definition of a "gravely disabled" person within the meaning of the Act. Petitioner also contends that the trial court erred in refusing to allow him to call respondent as a witness, in giving argumentative jury instructions and in refusing to give an instruction proffered by petitioner.

Respondent contends that the case is moot, since Robert is again under conservatorship, and that to allow the state to appeal a jury determination that respondent is not "gravely disabled" violates his right against double jeopardy.

The following evidence was adduced at trial.

Robert Baber, 26, had been in and out of mental health facilities since the age of 14. He had been diagnosed by the county psychiatrist as a chronic

---

[1]Welfare and Institutions Code section 5008, subdivision (h)(1) defines "gravely disabled" as: "A condition in which a person, as a result of a mental disorder, is unable to provide for his basic personal needs for food, clothing or shelter. . . ."

[2]Unless otherwise stated, all references are to the Welfare and Institutions Code.

[3]Section 5361 provides that a conservatorship must be reestablished anew each year.

schizophrenic of the undifferentiated type.[4] Testimony at trial indicated that Robert had severe difficulty in coping with the world around him. His attention span was short, he lived largely within himself and he was preoccupied with internal stimuli and hallucinations. He was given Prolixin to help control the symptoms of his illness. Although he disliked this medication and thought it caused him to suffer hallucinations and increased nervousness, he never refused to take it. He was put on a special nutritional diet because he continued to lose weight. He adamantly disliked the food that was given to him and, if left on his own, would eat only the dessert. It was required that a nurse watch over him at meals to ensure that he ate.

His therapist reported that, although he was making gradual progress, his response to therapy was slow. He spent most of his time alone and refused to engage in work projects suggested by his therapist. He used day-passes, provided him by the staff of the sanitorium, to visit his mother about once a week. His eating habits improved on these visits, but even on these short outings he preferred to sit quietly within the confines of his mother's apartment and not venture forth into the outside world.

The undisputed testimony of the mental health clinicians who had either talked with Robert, or observed him, was that he could not provide for his own physical needs, for any determinable period, without the assistance of a third person. The county psychiatrist, who had examined Robert on a yearly basis for the previous six years, Robert's therapist and the head nurse who supervised him throughout the day, each testified that Robert needed constant professional care. The county mental health clinician examined Robert and, in his annual report, also recommended reestablishment of conservatorship.

The only professional analyst who thought Robert would be able to cope outside a clinical facility was the clinical psychologist who had been hired to testify on his behalf. Yet even this professional, who had only had the opportunity to speak with Robert for one hour, did not think Robert could provide for himself for any determinable period without the assistance of a third party.

The only evidence of available third party assistance was given by Mrs. Baber, Robert's mother, and a conservatorship investigator employed by Robert's attorneys. Mrs. Baber testified that she would only be able to take

---

[4]The county psychiatrist, Dr. Francis Crowley, explained that schizophrenia is a mental disorder in which a person experiences a mental split. When this occurs the person can become confused and preoccupied with what is taking place within himself, thus rendering him incapable of taking part in reality. "Undifferentiated schizophrenia" exists when the patient slips from one extreme (striking out at others) to the other (folding up into himself).

Robert in for two weeks, if he were released, due to space constraints in her apartment and restrictions imposed by her landlord. She was willing, however, to help Robert in locating an apartment and in managing his affairs. The conservatorship investigator testified that several community groups would be available to look in on Robert occasionally and to help him adjust to being independent.

The trial court did not allow petitioner to call Robert to the stand on the ground that this might compromise Robert's Fifth Amendment right not to be called as a witness against himself in a criminal proceeding. Robert's own counsel did not call him to testify on his own behalf.

The jury found that Robert was not "gravely disabled" within the meaning of the Act. Nine months later, the public guardian filed a new petition against Robert who was, again, made a public conservatee.

### Mootness

■ Because Robert has, again, become a conservatee of the public guardian, this case is technically moot. Yet, the issues raised by this case are of significance because they are certain to recur in other conservatorship cases in which a jury is asked to determine whether a potential conservatee is "gravely disabled." In addition, these issues will continue to evade review, for they will always be moot on appeal. The very nature of proceedings under the LPS Act allows the public guardian to file a new petition for conservatorship against a person at any time.

Therefore, because we believe that the public interest warrants a resolution of these issues, we " ' "exercise [our] inherent discretion to resolve' " them. (*Ballard* v. *Anderson* (1971) 4 Cal.3d 873, 876-877 [95 Cal.Rptr. 1, 484 P.2d 1345, 42 A.L.R.3d 1392].)

### Discussion

### I.

Respondent compares a civil conservatorship proceeding to a criminal trial and argues that the potential deprivation of the fundamental right to liberty entitles potential conservatees to both the right not to again be placed in jeopardy and the privilege not to testify in their own conservatorship trial. We disagree.

The California Supreme Court recently compared a proceeding for the commitment of mentally retarded persons to a criminal trial. Because we

find its rationale equally applicable to conservatorship proceedings, we have adopted the following language to illustrate some of the many differences we find between a conservatorship proceeding and a criminal trial. "The commitment is not initiated in response, or necessarily related, to any criminal acts; it is of limited duration, expiring at the end of one year . . . . The sole state interest, legislatively expressed, is the custodial care, diagnosis, treatment and protection of persons who are unable to take care of themselves and who for their own well being and the safety of others cannot be left adrift in the community [§ 5001]. The commitment may not reasonably be deemed punishment either in its design or purpose. It is not analogous to criminal proceedings." (*Cramer* v. *Tyars* (1979) 23 Cal.3d 131, 137 [151 Cal.Rptr. 653, 588 P.2d 793].)

The California Supreme Court has recognized the significant interest in liberty threatened by conservatorship proceedings. (*Conservatorship of Roulet* (1979) 23 Cal.3d 219 [152 Cal.Rptr. 425, 590 P.2d 1].) Yet, after carefully considering the purpose behind such proceedings and the safeguards provided against unnecessary commitment, it has concluded that the best interests of the potential conservatee would not be served by allowing him to engage in obfuscatory tactics. Indeed, the court has stressed again and again the importance of ascertaining the true state of respondent's disability in conservatorship proceedings. To this end, it has held that certain principles governing criminal trials are applicable and others are not.

In *Conservatorship of Roulet, supra,* the court held that respondents in conservatorship trials are entitled to a unanimous jury verdict and to a standard of proof beyond a reasonable doubt. The court believed that application of this standard would "ensure the correctness of the eventual verdict." (*Id.,* at pp. 233-234.) Yet, the subject of commitment proceedings for mentally retarded persons may not refuse to testify (*Cramer* v. *Tyars, supra,* 23 Cal.3d 131), despite the significant liberty interest at stake. In addition, the Second District Court of Appeal has ruled that a proposed conservatee is not entitled to a warning that incriminating evidence derived from his interview with a forensic psychiatrist will be used against him in a conservatorship proceeding. (*Conservatorship of Mitchell* (1981) 114 Cal.App.3d 606 [170 Cal.Rptr. 759].) This court, itself, has held that the rationale behind *Miranda* does not compel its use in commitment proceedings for mentally retarded persons. (*Cramer* v. *Shay* (1979) 94 Cal.App.3d 242, 245 [156 Cal.Rptr. 303].)

a. *Double jeopardy*

■ We believe that application of the doctrine of double jeopardy would frustrate, rather than promote, the discovery of truth in conservatorship

proceedings. We cannot overemphasize the importance of recognizing that a prospective conservatee is not a criminal defendant but, in many cases, a person in dire need of the state's assistance. A conservatorship proceeding is not a prosecution for a particular act, but an attempt to determine a condition which is subject to change. To apply the double jeopardy principle could deprive a person of much needed care, simply because he had previously been found not to need it.

We agree with the Court of Appeal's conclusion in *Conservatorship of Davis* (1981) 124 Cal.App.3d 313 [177 Cal.Rptr. 369], that it would be inconsistent to apply double jeopardy to bar a second trial on a petition to reestablish conservatorship, when there is, of necessity, no bar to the public guardian filing a new petition against respondent. "To speak in terms of double jeopardy as a bar in the face of such possible future changes [in respondent's condition] would be singularly inappropriate to the purposes and provisions of the LPS Act." (*Id.*, at p. 330.) The appeal does not violate respondent's rights against double jeopardy.

b. *Privilege against self-incrimination*

■ The same compelling need for truth in conservatorship proceedings governs our conclusion that a proposed conservatee cannot refuse to testify at his own conservatorship trial.

In *Cramer* v. *Tyars, supra,* 23 Cal.3d 131, the California Supreme Court held that mentally retarded persons do not have an absolute privilege to refuse to testify at their own commitment hearings. In so ruling, the court relied on the purpose of the proceeding and on the need to reveal to the trier of fact respondent's relevant physical and mental characteristics. (*Id.,* at p. 137.) Because commitment hearings and conservatorship trials both serve the same public purpose and threaten the same liberty interest, we hold, in accordance with *Cramer* v. *Tyars,* that a prospective conservatee may not refuse to testify in his own conservatorship trial. This holding does not, in any way, intimate that a prospective conservatee will be compelled to answer questions which may incriminate him in a criminal matter.

The trial court erred in refusing to allow petitioner to call respondent as a witness.

## II.

■ Petitioner next challenges the appropriateness of the trial court's definition of "gravely disabled" as proffered in its jury instructions. In this context he asks this court to disapprove the definition approved by the Sec-

ond District Court of Appeal in *Conservatorship of Davis, supra,* 124 Cal.App.3d 313, and to follow the First District Court of Appeal's definition as set forth in *Conservatorship of Buchanan* (1978) 78 Cal.App.3d 281 [144 Cal.Rptr. 241]. Since this case was argued, the California Supreme Court has resolved the conflict by approving the definition derived from *Davis* and disapproving *Buchanan. (Conservatorship of Early* (1983) 35 Cal.3d 244, 252-255 [197 Cal.Rptr. 539, 673 P.2d 209].)

a. *Conservatorship of Davis*

Welfare and Institutions Code section 5008, subdivision (h)(1) defines "gravely disabled" as: "A condition in which a person, as a result of a mental disorder, is unable to provide for his basic personal needs for food, clothing or shelter . . . ."

The *Davis* court analyzed the purposes of the LPS Act and determined that they were not consistent with a rigid interpretation of section 5008, subdivision (h)(1). Among others, the Act's objectives are "to end the inappropriate, indefinite, and involuntary commitment of mentally disordered persons . . . to eliminate legal disabilities . . . [t]o safeguard individual rights through judicial review . . . and to prevent . . . unnecessary expenditures. . . ." (§ 5001.) Consistent with these objectives, the sections of the Act which govern recommendation and establishment of a conservatorship set forth procedures which attempt to safeguard individual liberty, and accurately ascertain whether there is a true need for a conservator. (See, e.g., §§ 5352, 5354, 5350.)

The court also noted that there was no apparent legislative intent "that the contents of the [investigator's] report, including the person's family or social condition, should be excluded from evidence received for consideration by the trier of fact if the case is tried to a jury rather than a judge." (124 Cal.App.3d at p. 323.) The court eloquently stressed the importance of the constitutional right to liberty which proposed conservatees stand to lose. In light of its review of the entire Act, and the fundamental liberty interest threatened by a conservatorship, the court concluded that the jury's determination of whether a person is "gravely disabled" included a "determination of whether the establishment of a conservatorship is necessary *in light of all the relevant facts." (Ibid.,* italics added.) Those "relevant facts" specifically include a determination of whether a prospective conservatee "is capable of surviving safely in freedom with the help of willing and responsible family members, friends or third parties." *(Id.,* at p. 321.)[5]

---

[5]In *Conservatorship of Buchanan, supra,* 78 Cal.App.3d 281, the court had disagreed with appellant's contention that the trial court had erred in refusing to give instructions which provided that "one is not gravely disabled if capable of surviving with the help of willing relatives, friends or other third parties." *(Id.,* p. 289, fn. omitted.)

## b. *Jury instructions*

The trial court in the instant case adopted those jury instructions which were approved by the court in *Davis*.

In *Davis*, the trial court had instructed the jurors that, prior to considering whether respondent was "gravely disabled" within the meaning of section 5008, subdivision (h)(1), they were to determine whether she was, "as a result of a mental disorder, unwilling or *unable* to accept treatment for that mental disorder on a voluntary basis." (124 Cal.App.3d at p. 319, italics added.) If the jury found that respondent was willing and capable of making a meaningful commitment to a course of treatment, they were to find her "not gravely disabled." (*Ibid.*)

This instruction reflected the language of section 5352 which provides that a person must be both "gravely disabled" and unwilling or incapable of accepting treatment voluntarily before a petition for conservatorship may be filed against him.

In the instant case, the trial court omitted the word "incapable" from this preliminary instruction. The importance of this omission is reflected by the question the jurors asked the court during their deliberations: If they found merely that Robert was *willing* to accept treatment, did they necessarily have to find him not gravely disabled? The trial court responded that they did.

The evidence was undisputed at trial that Robert would accept the medication given him twice daily at Sierra Vista. But was he willing or capable of accepting treatment in a free situation? The evidence indicated that he was not, but, under this instruction, the jury might never have reached this important question. For this reason, we hold that the abbreviated instruction given by the trial court was error.

The second instruction approved by the court in *Davis*, and adopted by the trial court here, provided that: " 'if you find that [respondent] is capable of surviving safely in freedom by herself or with the help of willing and responsible family members or friends you shall find that she is not gravely disabled.' " (*Id.*, at p. 319.)

Although the *Davis* court upheld the lower court's exercise of discretion in giving these jury instructions, it neither commended them nor recommended that they be given as a matter of course in conservatorship cases. The California Supreme Court did. In *Conservatorship of Early, supra,* 35 Cal.3d 244, the Supreme Court held that it was error for the trial court to

refuse to admit evidence of and to fail to instruct on the "availability of assistance of others to meet the basic needs of a person afflicted with a mental disorder." (*Id.*, at p. 248.)

Thus, it appears that the Supreme Court has included a significant factor that was only implied in the *Davis* instructions, i.e., the availability of willing and responsible others so that the afflicted person will, *in fact,* be able to survive safely in freedom.

■ Petitioner next argues that, even were we to agree with *Davis,* the jury instructions given by the trial court were argumentative.[6] They argue, therefore, that we should find that the trial court abused its discretion. We disagree.

Although we recognize the possibility of confusion which might have arisen from these instructions, we do not find that the trial court abused its discretion in giving them. The trial court based its decision on sound authority. The instructions did not, as petitioner contends, put the court in the impermissible position of making an argument to the jury. (*Slayton* v. *Wright* (1969) 271 Cal.App.2d 219, 239 [76 Cal.Rptr. 494].)

■ Finally, petitioner argues that the trial court abused its discretion in failing to give one of petitioner's jury instructions.[7]

Although the instruction should be given, we think highly unlikely petitioner's argument that the jury concluded respondent would be willing to

---

[6]In addition to those instructions discussed above, the trial court gave the following instruction from *Conservatorship of Davis, supra,* 124 Cal.App.3d at page 329, footnote 7: "You are instructed that the term 'gravely disabled' means a condition in which a person, as a result of a mental disorder, is unable to provide for his basic personal needs for food, clothing or shelter. The ability to provide for these basic needs requires more than the physical and mechanical ability to do certain acts; it means that the person be able to function and maintain himself with or without the assistance of other available resources. However, he need not necessarily be financially capable of self-support; he need only be aware of the social services and resources available to him, and capable of applying any income he receives, regardless of source, to provide for his basic personal needs."

"Psychosis, bizarre behavior, delusions or hallucinations are by themselves insufficient to justify establishment of a conservatorship, unless you find that because of one or more of these, he is unable to provide for his basic personal needs for food, clothing or shelter.

"To find that the respondent is gravely disabled, due to a mental disorder, you must find that such condition exists at the present time, and not at some past or future date."

[7]Petitioner's proposed jury instruction reads as follows: "You are instructed that the matter of what kind or type of treatment, care or supervision shall be rendered is not a part of your deliberation, and shall not be considered in determining whether or not Robert Baber is or is not gravely disabled. The problem of treatment, care and supervision of a gravely disabled person and whether or not he shall be detained in a sanitarium, private hospital, or state institution, is not within the province of the jury, but is a matter to be considered by the conservator in the event that the jury finds that Robert Baber is gravely disabled."

accept treatment, based upon the mere evidence that alternative methods of treatment exist for his mental disorder. We do not believe that petitioner was unduly prejudiced by the trial court's refusal to give this instruction.

Due to the trial court's erroneous extension of the privilege against self-incrimination to deny petitioner the right to call respondent as a witness in the conservatorship proceeding, and its failure to instruct that the respondent could be found to be gravely disabled if he was, as a result of mental disorder, either unwilling or unable to accept treatment, the judgment is reversed.

Kaufman, J., and Rickles, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied June 27, 1984.