Filed 1/15/26  Conservatorship of H.D. CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sutter)

----

| | |
|---|---|
| Conservatorship of the Person and Estate of H.D. | C103148 |
| SUTTER COUNTY PUBLIC GUARDIAN CONSERVATOR,<br><br>Petitioner and Respondent,<br><br>v.<br><br>H.D.,<br><br>Objector and Appellant. | (Super. Ct. No. CVSM220001103) |

H.D. appeals from the trial court's January 2025 order reappointing the Sutter County Public Guardian Conservator (conservator) as H.D.'s conservator for one year (reappointment order).  H.D. contends the trial court erroneously compelled him to testify over his counsel's objections at the jury trial on reappointment.  H.D. also contends the court abused its discretion in imposing two special disabilities in the reappointment order,

1

prohibiting H.D. from (1) entering into contracts and (2) refusing medical treatment unrelated to his mental illness.

We conclude that any error in requiring H.D. to testify was harmless in light of the other evidence presented. We also conclude the challenged special disabilities were supported by sufficient evidence. We therefore affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In August 2024, conservator filed a petition for reappointment that H.D. opposed. H.D. requested a jury trial.

At a trial readiness conference, counsel for H.D. made an oral motion to prevent conservator from calling H.D. as a witness. The trial court ordered H.D.'s counsel to provide authority on the issue. The next day, H.D.'s counsel filed a motion in limine with attached authority that set forth a proposed instruction stating that H.D. has an "absolute constitutional right not to testify" and the jury should not consider that H.D. did not testify. On the first day of trial, counsel for conservator orally opposed the motion, arguing that *Conservatorship of Baber* (1984) 153 Cal.App.3d 542 established that there is no privilege against self-incrimination in a conservatorship proceeding. Counsel for H.D. countered that *Baber* did not involve a jury trial, a point which conservator's counsel disputed.

The trial court ruled that *Baber* "does appear to be good case law." The court added that a recent case involving sexually violent predators discussed "equal protection and whether or not someone has to testify. Not under a Fifth Amendment right, but under equal protection." The court deemed sexually violent predators to be "a different case." The trial court then ruled: "I agree with the County. Baber is right on point. It has not been overturned and so the Court is going to deny the motion to keep them from calling [H.D.] and then also instructing the jury on his right not to testify."

At the trial, Dr. Cathryn Adams testified as an expert in psychology. Dr. Adams reviewed H.D.'s records and met with H.D. for one hour.

2

Dr. Adams testified that, consistent with prior diagnoses, H.D. fit the criteria for schizophrenia. Dr. Adams based this diagnosis on reviewing H.D.'s records and meeting with him.

In Dr. Adams's meeting with H.D., he frequently displayed disorganized thoughts. H.D. veered off topic and Dr. Adams had to bring him back to what they were discussing. When H.D. went off topic he displayed evidence of paranoia. H.D. said he believed there were agents acting against him who were responsible for his current situation. H.D. "mentioned the state department on multiple times having some kind of plan for him and his engagement with the state department in the past." Dr. Adams testified that disorganized behavior can impair the ability to use resources. A person might be aware of resources available but be unable to use them in an organized fashion.

Dr. Adams further testified that H.D. did not demonstrate insight regarding his mental health condition. When Dr. Adams asked H.D. if he had a mental health disorder, H.D. said he had bipolar disorder and mood instability. When asked about any history of psychotic symptoms, H.D. denied he had ever experienced them, a view contradicted by his medical records. Notes in the records contained frequent references to H.D. expressing delusional beliefs, particularly paranoid beliefs, as well as H.D. responding to "internal stimuli," the clinical term for talking to someone who is not there.

Dr. Adams testified that because of his paranoia, H.D. becomes aggressive and combative, which impairs his ability to be safe in a lower level of care or in a community setting. As of January 2025, H.D. resides in a facility that provides structured care. The facility is locked, which provides a level of control to make sure a person leaving the facility is doing so with appropriate supervision. In December 2024, however, H.D. was in an inpatient facility for a person who needed to be more locked down. H.D. had assaulted a staff member, who was found on the floor after being struck by H.D. on the back of the head. At the time, H.D. was expressing paranoid beliefs and was hyperverbal

3

and nonsensical, indicating a strong possibility that this incident was the result of H.D.'s schizophrenia. H.D. had been involved in two assaults since October 2024.

Dr. Adams testified that H.D. is currently taking three antipsychotic medications. Dr. Adams opined that if H.D. did not take these medications, his symptoms would worsen. She noted that H.D. has indicated a willingness to continue these medications, but he believes the dosage is wrong and he should receive a "stimulating medication," which is a medication for attention deficit disorder. H.D. has never been diagnosed with attention deficit disorder. Dr. Adams was concerned H.D. would not continue to take medications if placed in the community, noting that previously he has not taken his medications.

Dr. Adams related that during the interview, H.D. said that if he were not in a conservatorship, he planned to live in a trailer he owned. When asked where the trailer was, H.D. said this information was "confidential." The conservator confirmed that H.D. did not own any trailers. When Dr. Adams asked H.D. what he would do if the trailer was not available, he acknowledged that he had not seen it in five years. His backup plan was to go to a homeless shelter. Dr. Adams expressed concern for the safety of all involved if H.D. were living in a communal environment, where H.D. might become combative given his ongoing symptoms of paranoia.

Dr. Adams concluded H.D. was currently gravely disabled, meaning he was unable to care for his food, clothing, or shelter.

On cross-examination, Dr. Adams acknowledged that many people with schizophrenia live and work outside hospitals with normal families. She said the difference between H.D. and those people is their level of insight about their condition.

Wanda Short, the conservator, also testified at trial. In deciding to seek the reappointment order, Short considered that, due to instances of H.D. assaulting people and refusing medication, he currently lives in a locked facility, which is the highest level of security other than a state hospital. The facility is staffed with primary care providers,

4

psychiatrists, nursing staff, social workers, and dieticians.  While the doors are locked, it is not a jail.  If things are going well and the person is participating in the program, the person can go out sometimes to see specialty doctors.

Short testified that, despite taking medications, H.D. has remained paranoid. Towards the end of last year, H.D. assaulted a peer and a staff member.  Sometimes H.D. takes medication willingly but sometimes he absolutely refuses.

Short noted that H.D. does not acknowledge he has a mental health disorder.  H.D. does not believe he needs medication because he does not believe he has a mental illness. H.D. believes that his situation is someone else's fault, and medication would not be necessary if people would leave him alone.  H.D. has not said he would continue his medication if placed in the community, and Short did not believe he would take his medication.

Short related that in discussions of his plan to provide for his basic needs, H.D. usually said that "he would figure out a way to do it."  H.D. has acknowledged being homeless for years off and on.  He said he came to the area because the DMV gave him a new driver's license that he thought was not his, even though the license bore his name and photograph.  H.D. repeatedly went to the DMV demanding a new license.  Short testified H.D. was receiving Social Security at the time, but he tore up the checks instead of using them to pay bills or buy food, because H.D. believed his identification was "fake," and if he used the identification to cash the checks, it would be "fraud."

In Short's opinion, H.D. cannot provide for his basic needs.  He still has not expressed a plan how he would provide for his basic needs if placed in the community.  If not receiving his current level of care, H.D. would go back to being homeless due to his lack of insight.  H.D. has a long history of not taking medication, using other substances, and getting into altercations with law enforcement.  H.D. continues to believe that his problems stem from police victimizing him.

5

H.D. was the last witness called by conservator. H.D. testified that he is not schizophrenic but bipolar. Asked whether he recalled Dr. Adams and Short testifying about his belief that agents are acting against him, H.D. said, "No. Yes and no. I said I tried telling them that I want to go to competency class. I come back in competency. I don't understand the court that well. They have me down as a sex offender. I'm not. In '97 I was subpoenaed to testify against somebody – for somebody as a character witness and he is saying I'm a rat and now he's got a bunch of my money. I think he's the one that did that to some – a whole bunch of my friends and stuff, so that's all I've got to say. You can believe it or not believe. The law can't figure out what they are doing. You are wrong."

H.D. testified he was taking medications, but he told Dr. Adams there was something better for bipolar. He testified he would continue to take the medications if the conservatorship ended, even though he did not believe he was schizophrenic. Regarding his plan to meet his basic needs for food, clothing, and shelter, H.D. testified, "I would go to the shelter and if I had some money I would go and buy some supplies and stuff and go to a shelter and get me a bicycle, like I did before, and go get me a car and get me a truck — a car or truck and go back to work. [¶] I would like to add that when I had to leave there, I went back and I found out my girlfriend and my kids were gone."

Asked where H.D. went before returning to the shelter, H.D. said, "And he's been roaming around in Riverside County and Sutter County. He's a killer of children. He's killed kids and threw them in the lake. I know it." H.D. testified he did not know who the killer was, but "Sutter County needs to catch him," and "I think it might be the guy that I was subpoenaed in '97 as a character witness out of Sutter County."

Asked by his counsel if he had a home somewhere he could go to, H.D. responded, "I lost it thanks to this incarceration." H.D. said he had family but not in California, and he did not have an uncle or aunt he could live with. H.D. added: "I'm not going to jeopardize their lives with that sicko on the loose."

6

H.D. was asked about providing for his basic needs of food, clothing, and shelter through somebody with a house that H.D. could rent or live in or providing for those basic needs by enrolling in a program somewhere. H.D. responded: "Yeah, out of state. Preferably out of Sutter County. When I left that disabled place, they said I was incompetent. They were giving me bad drugs. I was supposed to come back for my drugs being changed. They said that -- come to find out whatever it was could have killed me and officers was mainstreaming. There were shots and a syringe. I was HIV, HIC negative, zero diseases in Nevada, other states and everywhere else. [¶] In America I worked and they know it because I was incarcerated for drunk in public. I did it deliberately. This guy has been telling everybody in the prisons and everything else I'm running around and spreading diseases and I'm not, but now I probably have it because one of these punks in here poisoned me with the needles."

H.D. named some of the medications he is taking but could not remember others. Asked if he thought the medications were helping him, H.D. said, "I was taking a stimulant that was issued in state prison. They had me down as a vic. I told them about that crazy guy running around. He got out. He had a life sentence under a different name. It wasn't his real name. Damn it. [¶] My partner in the California lottery got whacked. I signed a ticket. He's in CDC. They actually released him and gave us the death penalty for his shit out of Sutter County."

Lastly, when asked by his counsel if he had a friend somewhere to help him, H.D. said: "There might be someone down at the mission that knows me, but I don't know. [¶] I was convicted falsely and arrested for burglary in my home out of Sutter County. I filed a lawsuit. They draw it out of Sutter County's account and it went right back in Sutter County's account. My federal attorney told me all about it in another state."

The jury found H.D. gravely disabled due to a mental disorder. After the verdict was read, the trial court stated that it had received a proposed reappointment order from conservator. H.D.'s counsel confirmed that he had received the proposed order and did

7

not object to it.[1]  The trial court signed and filed the reappointment order that imposed several disabilities under Welfare and Institutions Code section 5357,[2] including that H.D. could neither enter contracts nor refuse medical care unrelated to his mental health. On February 6, 2025, letters of conservatorship were filed.  H.D. timely appealed.

DISCUSSION

I

*Legal Background*

"The [Lanterman-Petris-Short] Act [LPS] authorizes short-term involuntary detentions [citations] and one-year conservatorships for those who are gravely disabled due to a mental health disorder or chronic alcoholism." (*Public Guardian of Contra Costa County v. Eric. B.* (2022) 12 Cal.5th 1085, 1095 (*Eric B.*), citing §§ 5150, 5250, 5350.)  In this context, " 'gravely disabled' " means "[a] condition in which a person, as a result of a mental health disorder, . . . is unable to provide for their basic personal needs for food, clothing, [or] shelter." (§ 5008, subd. (h)(1)(A); see *Conservatorship of S.A.* (2020) 57 Cal.App.5th 48, 54.)

"When a treatment professional determines a person is gravely disabled and unwilling or unable to accept treatment voluntarily, the county's public guardian may petition to establish a conservatorship." (*Eric B., supra,* 12 Cal.5th at p. 1095, citing § 5352; see also *Conservatorship of K.P.* (2021) 11 Cal.5th 695, 708-709 (*K.P.*).)  "If the matter proceeds to trial and the person is found gravely disabled, the court appoints a conservator [citation], imposes 'disabilities' as needed [citation], and determines an

---

[1]  H.D.'s counsel's failure to object to the order did not operate as H.D.'s consent to the special disabilities.  (*K.G. v. Meredith* (2012) 204 Cal.App.4th 164, 182 ["due process require[s] the proposed conservatee's *personal* consent to imposition of a decisional disability"], citing *Conservatorship of Christoper A.* (2006) 139 Cal.App.4th 604, 613.)

[2]  Undesignated statutory references are to the Welfare and Institutions Code.

8

appropriate treatment placement." (*Eric B.*, at pp. 1095-1096, citing *K.P.*, at pp. 709-710.) "A conservatorship terminates after one year but may be extended for additional one-year terms upon petition." (*Eric B.*, at p. 1096, citing § 5361.)

II

*Testimony of H.D.*

H.D. contends the trial court committed prejudicial error in requiring him to testify. H.D. acknowledges that *Baber* "explicitly holds that 'a proposed conservatee cannot refuse to testify at his own conservatorship trial.' " (*Conservatorship of Baber, supra,* 153 Cal.App.3d at p. 550.) H.D. argues, however, that in *Eric B.,* the California Supreme Court disapproved *Baber* in ruling, "based upon an equal protection analysis, persons subject to LPS conservatorships are sufficiently similar to persons subject to extended commitments based upon being Not Guilty by Reason of Insanity (NGI). Since NGIs cannot be compelled to testify neither can LPSs unless the government shows, by the appropriate standard, a governmental interest sufficient to justify the disparate treatment."[3] (Citing *Eric B., supra,* 12 Cal.5th at pp. 1091, 1106-1107; see *People v. Field* (2024) 106 Cal.App.5th 132, 141, fn. 5 [in *Eric B.,* LPS conservatees were determined to be similarly situated to NGIs regarding the testimonial privilege provided by statute].)

Conservator concedes "more recent case law has applied equal protection principles to LPS conservatees for purposes of compelled testimony." Conservator argues, however, that because H.D. did not raise an equal protection claim in the trial court, he has forfeited the claim on appeal. Conservator points out that *Eric B.* held there was no *constitutional* protection against compelled testimony in LPS proceedings and

_____

[3] On reply, H.D. acknowledged that the high court held in *People v. Cannon* (2025) 18 Cal.5th 497, that the rational basis standard is the applicable standard to assess the governmental interest.

9

based its equal protection analysis entirely on the *statutory* right afforded NGI's not to testify, which did not exist for LPS conservatees. (*Eric. B., supra,* 12 Cal.5th at p. 1098.) In this case, H.D.'s motion in limine asserted his constitutional right not to testify but did not mention equal protection. Moreover, although the trial court in considering H.D.'s motion in limine expressly referred to the *Field* case and its equal protection analysis, counsel for H.D. failed to take this opportunity to argue a violation of H.D.'s right to equal protection from compelled testimony.

On reply, H.D. argues that if this court agrees with respondent that his equal protection claim was not preserved for appeal, this failure constituted ineffective assistance of counsel. We granted H.D.'s request to file a supplemental brief making that argument. H.D. filed a supplemental brief, and conservator filed an opposition.

We conclude we need not resolve whether H.D. forfeited an equal protection claim on appeal or, if so, the failure to raise it below amounted to ineffective assistance of counsel, because any error in compelling H.D. to testify was harmless. (See *Eric B., supra,* 12 Cal.5th at pp. 1107-1108 [the government's failure to justify disparate treatment of conservatees for purposes of the right against compelled testimony was harmless error].)

Here, as in *Eric B.*, " 'two other witnesses who were familiar with appellant . . . painted a vivid picture of someone who was unable to care for himself left to his own devices due to his mental illness.' " (*Eric B., supra*, 12 Cal.5th at p. 1107, quoting *Conservatorship of E.B.* (2020) 45 Cal.App.5th 986, 999.) Dr. Adams testified H.D. veered off topic into statements regarding his paranoid beliefs that government agents were responsible for his circumstances, denied he had a mental health disorder or that he had experienced psychotic symptoms, and identified a nonexistent trailer where he would live if the conservatorship ended. H.D. also told Dr. Adams he would live in a homeless shelter, but that option would be unsafe given his combative and aggressive behavior due to ongoing paranoia symptoms. H.D. had assaulted a staff member, even though he was

10

receiving antipsychotic medication. While H.D. told Dr. Adams he would continue taking medication if placed in the community, he had not previously done so. Without medication, Dr. Adams believed his symptoms would worsen.

Conservator Short echoed Dr. Adams's testimony regarding H.D.'s paranoia symptoms, disbelief that he has a mental disorder or needs medication, and assaults, not only on a staff member but also a peer. Short provided illustrations of H.D.'s paranoid behavior in the community: tearing up a driver's license with his name and photo as "fake" and tearing up Social Security checks because to cash them to pay bills or buy food with a "fake" identification would be "fraud." H.D. was homeless before the conservatorship and Short testified he would go back to being homeless, not taking his medication, and getting into altercations with law enforcement if placed in the community.

H.D. nonetheless contends that the error was prejudicial, asserting his testimony "badly hurt his case" because his plans for release were "flawed" and his willingness to take medication "limited." He asserts that both Dr. Adams and Short testified that H.D. said he would be willing to continue with his medication if placed in the community.[4] H.D. maintains that applying the standard of *People v. Watson* (1956) 42 Cal.2d 818, 837—a reasonable probability of a more favorable outcome in the absence of error—a reasonable jury could have found H.D. was not gravely disabled and could provide for his food, clothing, and shelter in the community.

H.D. acknowledges that Dr. Adams and Short "provided substantial evidence to support the determination that appellant was gravely disabled." Indeed, these witnesses provided compelling testimony on the subject, and therefore, H.D.'s testimony was unnecessary for the conservator to prove its case. (See *Conservatorship of E.B., supra,*

---

[4] Short, in fact, testified that H.D. had not told her that he would continue to take medication if not conserved, and she did not believe he would.

11

45 Cal.App.5th at p. 999.)  Even if jurors had not observed H.D.'s demeanor and heard his testimony, they would nonetheless know, among other things, that H.D. was diagnosed with schizophrenia; was on antipsychotic medication that failed to completely control his aggressive behavior, including an assault on a staff member; denied he had a mental illness and believed medication was unnecessary; and when placed in the community, stopped taking medication, was homeless, and engaged in altercations. Crucially, both Dr. Adams and Short testified that, based on his record, H.D. would not continue taking medication if he were released in the community.  We conclude H.D. cannot show a reasonable probability that jurors would not have found him gravely disabled had he not testified.  (*People v. Watson, supra,* 46 Cal.2d at p. 837.)  As to the disabilities imposed by the trial court, we similarly conclude H.D. cannot show a reasonable probability that the court would not have imposed those disabilities had he not testified.  As explained fully in part II below, Short's testimony supported the contracting disability and both Short's and Dr. Adams's testimonies supported the medical treatment disability.

Our conclusion that any error in compelling H.D. to testify was harmless under *Watson* disposes of H.D.'s ineffective assistance claim, because any ineffective assistance did not prejudice H.D.  (See *Strickland v. Washington* (1984) 466 U.S. 668, 691-692 [to establish an ineffective assistance of counsel claim requires the claimant to show both deficient performance and prejudice]; *People v. Xiong* (2020) 54 Cal.App.5th 1046, 1068, fn. 11 [court's finding of harmless error under *Watson* precluded ineffective assistance claim because the *Strickland* prejudice standard "is essentially the same" as the *Watson* standard].)

II

*Sufficient Evidence Supports the Trial Court's Imposed Disabilities*

H.D. contends that insufficient evidence supports three of the trial court's imposed disabilities:  the no contracting disability and two disabilities regarding medical treatment

12

not related to grave disability. The reappointment order provides in relevant part that H.D. shall not have the right to "enter into contracts," "refuse or consent to medical treatment unrelated to grave disability or to an existing or continuing medical condition," and "refuse or consent to other medical treatment not related to conservatee's grave disability."[5] We conclude substantial evidence supports the imposition of these disabilities.

A finding of grave disability alone is not sufficient to justify the imposition of the various special disabilities enumerated in section 5357. (§ 5005.) A conservatee retains the rights and privileges covered by the special disabilities unless the trial court, after making separate findings of incapacity to support the imposition of the special disabilities, imposes those disabilities and confers corresponding authority on the conservator. (*Conservatorship of George H.* (2008) 169 Cal.App.4th 157, 165.) Because the special disabilities deprive the conservatee of substantial constitutional rights, due process must be afforded before these rights are compromised. (*Conservatorship of Christopher A.* (2006) 139 Cal.App.4th 604, 612.) " 'The party seeking conservatorship has the burden of producing evidence to support the disabilities sought, the placement, and the powers of the conservator, and the conservatee may produce evidence in rebuttal.' " (*George H.*, at p. 165.) In other words, there must be evidence in the record to support each of the specific disabilities imposed. (*Id.* at pp. 165-166.)

The trial court is not required to make a "specific, on-the-record statement of the reasons for each order" regarding a special disability. (*Conservatorship of George H.,*

---

[5] We agree with H.D. that the meaning and purpose of the reference to an "existing medical condition" is obscure on this record. We note that section 5357, subdivision (e) refers to imposition of a disability of the "right to refuse or consent to routine medical treatment unrelated to remedying or preventing the recurrence of the conservatee's being gravely disabled." H.D. focuses, as do we, on disability of the right to refuse or consent to such medical treatment "unrelated" or "not related" to his grave disability.

*supra,* 169 Cal.App.4th at p. 165.)  Nor does a conservator need to address each special disability by unique evidence directed at a particular disability.  (*Ibid.*)  We will affirm the trial court's imposition of special disabilities so long as substantial evidence supports each disability.  (*Ibid.*)

Under the substantial evidence standard, "[t]he testimony of one witness may be sufficient to support such a finding.  [Citation.]  We review the record as a whole in the light most favorable to the trial court judgment to determine whether it discloses substantial evidence.  Substantial evidence . . . is evidence that is reasonable, credible, and of solid value . . . ."  (*Conservatorship of Carol K.* (2010) 188 Cal.App.4th 123, 134.)  In reviewing the record for substantial evidence, we presume the existence of every fact the trier of fact could have reasonably deduced from the evidence.  (*People v. Johnson* (1980) 26 Cal.3d 557, 576.)  But we do not resolve conflicts in the evidence or reweigh the evidence, nor do we reevaluate the credibility of witnesses, as "those functions are reserved for the trier of fact."  (*People v. Riley* (2015) 240 Cal.App.4th 1152, 1163.)  "Substantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom."  (*Conservatorship of Walker* (1989) 206 Cal.App.3d 1572, 1577.)

A.

*Contracting Disability*

H.D. does not contend "that he should have unlimited rights to contract for anything at any time for any amount of money."  His argument is that the trial court should have imposed a threshold barring H.D. from entering into contracts for more than $15, $25, or $100, as other counties do.  We conclude sufficient evidence supports the no contracting disability as ordered by the trial court.

The standard to impose a no contracting disability is found in Civil Code section 1556, which prohibits persons of "unsound mind" from contracting.  Such incapacity has been categorized as follows:  (1) entirely without understanding (Civ. Code, § 38); (2) unsound but not entirely without understanding (*id.*, § 39); or (3) susceptible to undue

14

influence (*id.*, § 1575; *Smalley v. Baker* (1968) 262 Cal.App.2d 824, 834-835, disapproved on another ground in *Weiner v. Fleischman* (1991) 54 Cal.3d 476, 485-486).

Here, Short testified that H.D. received a new driver's license with his correct name and photo but refused to believe it was his identification. He repeatedly went to the DMV demanding a new driver's license. Because H.D. believed his driver's license was not his, he tore up Social Security checks instead of cashing them to pay for food, clothing, or shelter, believing that it would be fraud to cash them with an identification he wrongly thought was fake. Where, as here, H.D. could not recognize that a DMV-issued identification with his photo and name was valid, so he destroyed money he needed to provide for the necessities of life, the trial court had substantial evidence to base a disability that prohibited him from entering into contracts. H.D. may not be entirely without understanding but he is of unsound mind.

H.D. asserts that the no contracting disability precludes him from any small transactions such as buying a candy bar from a vending machine. He argues that if this disability is supported by substantial evidence, it could be imposed in every conservatorship, because all conservatees are irrational or engage in irrational behavior. But here H.D. acted on a delusion that directly concerned his financial circumstances. He destroyed valuable Social Security checks due to his ongoing paranoia. A delusion of this nature raises concerns about H.D.'s behavior in financial transactions. We therefore conclude a no contracting disability that does not attempt to set a monetary level is supported by substantial evidence.

B.

*Medical Treatment Disability*

H.D. contends that the two disabilities regarding medical treatment unrelated to his grave disability are unsupported by evidence, arguing there is nothing in the record suggesting H.D. could not be trusted to decide "whether to take cough syrup if he had a

15

cold or that he would refuse to accept treatment for a broken arm should he suffer one." We conclude sufficient evidence supports imposition of these disabilities.

To determine whether a person is incapable of making medical treatment decisions, we ask: " ' " (a) whether the patient is aware of his or her [or their medical] situation . . . ; (b) whether the patient is able to understand the benefits and the risks of, as well as the alternatives to, the proposed intervention . . . ; and (c) whether the patient is able to understand and to knowingly and intelligently evaluate the information required to be given patients whose informed consent is sought [citation] and otherwise participate in the treatment decision by means of rational thought processes." ' " (*K.G. v. Meredith, supra,* 204 Cal.App.4th at p. 180.)

We conclude the record supports imposition of the special disability that H.D. should not have the right to refuse or consent to medical treatment unrelated to his grave disability due to a mental disorder based on the substantial evidence we now recount. To begin with, there was evidence H.D. failed to understand his medical situation. Dr. Adams testified that H.D. generally exhibited disorganized thinking that could impair his use of resources. H.D. tended to veer off topic into paranoid statements. H.D.'s medical records indicated he was observed responding to "internal stimuli," i.e., talking to someone who is not there, indicating H.D. may at times listen to the thoughts in his head rather than external information. Further, H.D. denied he had mental illness and needed medication, sometimes refusing to take medication when housed in his current facility and not taking medication when in the community. It is reasonable to believe, therefore, he would be similarly unrealistic about other types of medical intervention. In addition, due to his ongoing paranoia, H.D, becomes aggressive and combative—H.D. assaulted a staff member during a paranoid episode—behavior that could recur during attempted medical treatment. From this evidence, the trial court could reasonably infer that due to H.D.'s continuing paranoid delusions he would " ' " 'lack[] the mental capacity to

16

rationally understand the nature of the medical problem, the proposed treatment and the attendant risks.' " ' " (*K.G. v. Meredith, supra*, 204 Cal.App.4th at p. 179.)

## DISPOSITION

The order is affirmed.

/s/_____
MESIWALA, J.

We concur:

/s/_____
RENNER, Acting P. J.

/s/_____
FEINBERG, J.